[Crim. No. 8062. In Bank. Dec. 15, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. ISMAEL ORTEZ GALLEGOS, Defendant and Appellant.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

Raymond Gloozman, under appointment by the Supreme Court, for Defendant and Appellant.

Stanley Mosk and Thomas C. Lynch, Attorneys General, William E. James, Assistant Attorney General, and Felice R. Cutler, Deputy Attorney General, for Plaintiff and Respondent.

PEEK, J.—Defendant's appeal from a judgment of conviction for the unlawful possession of heroin (Health & Saf. Code, § 11500) in count I and the unlawful possession of marijuana (Health & Saf. Code, § 11503) in count II, is on the ground that admission of incriminating real evidence was improper because it was the product of an illegal search and seizure. He was also found to have suffered a prior conviction and imprisonment for a violation of section 11500 of the Health and Safety Code.

Only two witnesses were called by the prosecution, the arresting officer and a forensic chemist. The officer testified that other officers had taken into custody one Thomas Renteria when found in his automobile unconscious from an overdose of heroin; that while still under the influence of the drug Renteria informed the arresting and other officers that he had purchased and administered to himself the drug at an apartment occupied by a person known to Renteria only by a nickname; that while he did not know the address of the apartment he nevertheless accompanied officers to the apartment building and designated the particular premises where the alleged purchase had been made; that he further informed the officers that the person residing there drove a

black 1937 Plymouth automobile; that on no prior occasion had the officers had contact with Renteria, and that they had no knowledge upon which they could judge his reliability as an informer.

The officer further testified that he and the other officers took Renteria to the sheriff's office and then returned to the apartment house at approximately 11:30 p.m.; that when no one answered their knock they placed the premises under surveillance; that at 1 the following morning they observed defendant alight from a black 1937 Plymouth; that as he inserted a key into the lock of the apartment the officers approached and identified themselves. Thereafter, the officer testified: '' . . . I asked him if he had been arrested for narcotic violations in the past, and he stated he had, that he was at that time currently on parole for narcotic violation. At that time I placed him under arrest.''

The only other testimony bearing on the arrest was that of defendant who on direct examination denied that he was on parole and further on cross-examination denied that he had so advised the officer. It does not otherwise appear whether defendant was on parole. In any event the record does not disclose and no claim is made that he was detained as a possible parole violator or that his premises were searched for that reason. ■ Although under ordinary circumstances a parolee's place of residence may be searched prior to an arrest (see *In re Ferguson,* 55 Cal.2d 663, 670 [12 Cal. Rptr. 753, 361 P.2d 417]; *People* v. *Contreras,* 154 Cal.App. 2d 321, 325 [315 P.2d 916]), in the instant case the status of the defendant as a parolee was not relied upon by the arresting officer. Hence, lacking evidence in this regard, the search of defendant's premises which immediately followed the arrest, and the results thereof, could not be utilized in justification of the arrest.

■ The search of defendant's apartment disclosed marijuana and heroin, as well as implements used in administering narcotics. Numerous puncture marks were observed on defendant's arms, and a rent receipt showing defendant to be the lessee of the apartment was also discovered. Although two and a half hours had elapsed since the officers were first informed of the alleged violation they had made no attempt to obtain a warrant for either the arrest or the search.

■ The officers' factual knowledge going to the commission of a crime at the time of the arrest was obviously meager. In determining whether such knowledge constituted probable

cause for the arrest, and thus justified the following search and seizure, it is incumbent that we consider the source of that knowledge. Renteria was an informer of unknown reliability still under the influence of narcotics when· he revealed that a sale of narcotics had been made in the particular apartment, and that the person residing therein drove a black 1937 Plymouth. Standing alone, his information did not constitute reasonable cause for arrest (*Ovalle* v. *Superior Court,* 202 Cal.App.2d 760 [21 Cal.Rptr. 385]), and before the officers could be justified in making an arrest without a warrant they were required to obtain other independent evidence in corroboration of the incriminating facts supplied by their untested informer. (*Willson* v. *Superior Court,* 46 Cal.2d 291, 294 [294 P.2d 36]; *People* v. *Amos,* 181 Cal. App.2d 506, 508 [5 Cal.Rptr. 451].) Such corroboration is claimed to consist of the knowledge gained by the officers when they observed defendant alight from the car described by Renteria, prepare to enter the apartment, and his statement that he resided therein. But these facts merely establish that the person who resided in the apartment drove the particular automobile. This bit of corroborated fact does little to bolster the untested informer's report of illegal activity, and is almost insignificant as far as any incrimination is concerned. And the additionally ascertained fact of defendant's narcotics record, while more significant, does not bolster the officers' knowledge sufficiently to constitute probable cause. Such evidence has at best only a slight tendency to establish that defendant was presently engaged in illegal conduct. (*People* v. *Reeves,* 61 Cal.2d 268, 274 [38 Cal.Rptr. 1, 391 P.2d 393].)

We have recently held in the *Reeves* case that when officers were advised by an anonymous informer that a named person was in possession of narcotics at a given address, the further knowledge of the officers that such person had a narcotics record did not justify his arrest for the reason that "it was not corroboration of the essential fact, as to whether [the defendant was] now violating the law." (*People* v. *Reeves, supra,* 61 Cal.2d 268, 274.)

We cannot distinguish the *Reeves* and the instant case in any material respect going to the issue of probable cause, and what immaterial differences do exist point to greater cause in *Reeves* than in the instant case. In each, officers were informed of a claimed narcotic violation, the informer was untested, the address at which the claimed violation took

place was given, and in the instant case the person who resided there was described by the car which he drove whereas his name was actually made known in *Reeves*. Additionally the officers independently ascertained only that in each case the suspect had a prior record as a narcotic violator, although in *Reeves* the officers further ascertained that a cosuspect named by the informer *also* had a prior record as a narcotic violator.[1] If probable cause was lacking in *Reeves*, as we held it was, manifestly it is also lacking in the instant case.

The further distinction that in *Reeves* the officers were given anonymous information whereas in the instant case their information came from a known informant in their custody, does not aid the People. To hold that the information furnished by Renteria was sufficient to establish reasonable cause "would be in effect to accord to a nonreliable informant who was in the toils of the law a greater degree of reliability than is attributed to such an informant who is not thus encumbered." (*People* v. *Amos, supra,* 181 Cal. App.2d 506, 509.)

In view of the foregoing it is apparent that the evidence obtained was the result of an illegal search and seizure in violation of constitutional guarantees (U.S. Const., 4th and 14th Amends.; Cal. Const., art. I, § 19), and that on the instant record its admission was prejudicial error (Cal. Const., art. VI, § 4½). Accordingly, the judgment is reversed.

Traynor, C. J., Peters, J., Tobriner, J., and Dooling, J.,* concurred.

SCHAUER, J.,* Dissenting.—The circumstances delineated in the reporter's and clerk's transcripts (which are epitomized in the majority opinion) in my view are ample to support the trial court's finding of probable cause for the defendant's arrest and the ensuing search and seizure of contraband.

The resolution of conflicting testimonies and inferences was essentially for the trial court and I do not understand that *People* v. *Reeves* (1964) 61 Cal.2d 268 [38 Cal.Rptr. 1, 391 P.2d 393] is intended to modify that fundamental distinction between trial and appellate jurisdiction; it remains our

---

[1]Additional information which would have justified the search in *Reeves* was held to have been illegally obtained, and the officers were thus not entitled to rely thereupon. (*People* v. *Reeves, supra,* 61 Cal. 2d 268, 274.)

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

duty to indulge every reasonable presumption in favor of sustaining the trial court. We do not (in contrast to the situation in *Reeves*) have in this case a mere uncorroborated telephoned statement from an anonymous, unknown and unseen informer; to the contrary, substantially all of the informant's statements were strongly corroborated (1) by his appearance, condition and position when apprehended by deputy sheriffs, all as interpreted in the light of their expert knowledge, and (2) by the acts and statements of the defendant before (as well as after) his arrest. Furthermore the very substance of the informant's statements gives them a type of corroborative sanction.

Among other relevant facts it appears that this defendant at all times concerned was already under "arrest" in a significant sense. Arrest means taking a person into custody or placing him under personal restraint. Insofar as his civil rights may be involved defendant was in legal custody at the time of the events in question. He theretofore had been arrested for a narcotics offense; such prior arrest had culminated in conviction and sentence for violation of section 11500 of the Health and Safety Code, a felony, and defendant was serving a part of that sentence on parole. Upon conviction of the felony and sentence to the state prison for a term less than life his civil rights were suspended. (Pen. Code, § 2600.) "Prisoners on parole shall remain under the legal custody of the department and shall be subject at any time to be taken back within the inclosure of the prison." (Pen. Code, § 3056.) A convicted prisoner on parole is in contemplation of law still a prisoner, and possesses only such civil rights as the parole authority may have granted. (See Pen. Code, § 3054.) "The only difference in his status from that of other prisoners is that he is permitted to remain outside the prison walls, although he is still in custody. In the *Denne* case [*People* v. *Denne* (1956) 141 Cal.App.2d 499, 509 [9a]-510 [9b] (297 P.2d 451)] the court further held that the place of residence of a parolee may be entered and searched by prison officials or parole officers in the same manner as the search of a prisoner's cell...." (*People* v. *Contreras* (1957) 154 Cal.App.2d 321, 325 [3] [315 P.2d 916]; see also Cal.Const., art. X, § 7; *In re Ferguson* (1961) 55 Cal.2d 663, 670 [2] [12 Cal.Rptr. 753, 361 P.2d 417].) There is no suggestion in the record that the parole authority had granted this defendant the right to possess or deal in heroin or be immune from search of his premises for that narcotic.

The soundness of the quoted (*Contreras*) holding becomes particularly apparent if we consider the potentiality of its application to narcotic parolees (or so-called outpatients) when any such parolee has been accorded the benefits of the California Rehabilitation Center program. That enlightened project properly recognizes—and so should we—the notorious tendency of such persons to revert to their former addiction, and the corresponding duty of the program to furnish continuing and vigorously implemented supervision of a type which even the clever mind of a craving addict cannot long or often circumvent. To this end the Legislature has provided ''The rules for persons in outpatient status shall include but not be limited to close supervision of the person after release from the facility, periodic and surprise testing for narcotic use, counseling and return to inpatient status at the California Rehabilitation Center or its branches at the discretion of the authority, if from the reports of agents of the Department of Corrections or other information *including reports of law enforcement officers* as to the conduct of the person, the authority concludes that it is for the best interests of the person and society that this be done. [Added by Stats. 1963, ch. 1706, § 11.]'' (Italics added.) (Pen. Code, § 6517.)

In the trial of the case at bench it was stipulated that Deputy Sheriff Avila was ''an expert in the use of narcotics and in addiction.'' The deputy testified that he had a conversation with the informer, one Renteria; that the latter ''stated on the evening of November 9 he had gone to an apartment on Lynalan Street, and that he had gone into this apartment and purchased two capsules of heroin. He stated the person that lived at that location had attempted to inject him, the informant, with narcotics on either two or three occasions, that the person who had sold him these narcotics had been unable to administer the narcotics and that he then himself took the syringe and injected the heroin in himself.

''He stated the heroin must have been quite strong, because he got an overjolt, he received more narcotics than he had been accustomed to, and he had been helped to his automobile, where he had passed out from the overjolt of narcotics, and was then arrested in that vehicle, his vehicle.

''He stated the person that sold him the narcotics in Whittier lived in an apartment in Whittier, and that he did not know exactly where it was, but he would take the officers to that location and show the officers where it was.'' This, as will appear, he faithfully did.

The deputy further testified that in his opinion (and, of course, based on his personal observation and stipulated expertise) the informer was at that time "under the influence of some opiate"; that he examined such informer and observed "narcotic injection wounds"; that he and a brother officer took the informer to 8601 Lynalan Street "where the informant pointed out an apartment and stated this particular apartment was where he had been injected and where he had purchased the narcotics." These statements obviously were admissions against his interest and tended to incriminate the informer. The informant further stated that (as related by Deputy Avila) "the person who lived at that apartment was driving a black 1937 Plymouth, I believe, with primer spots on it."

The informant was then returned to the jail and the officers staked out near the identified apartment. A few hours later the officers observed the defendant alight from a vehicle which appeared to be a black Plymouth "perfectly" fitting the description theretofore given by the informant; defendant then walked up to the door of the identified apartment and inserted a key in the lock. These acts of defendant manifestly fitted in with, augmented and corroborated the informer's prior statements, and prima facie demonstrated the defendant's domiciliary control of the premises.

The officers then approached the defendant and the following events took place as related by Officer Avila: "I asked the defendant what his name was. At that time I identified myself, I showed him my identification badge, and I asked him what his name was. He stated his name was Ismael Gallegos. I asked him if he lived at that location. He stated he did. . . . I asked him if he had been arrested for narcotic violations in the past, and he stated he had, that he was at that time current on parole for narcotic violation. At that time I placed him under arrest."

It was further specifically testified that "We [the officers] waited until the key was inserted into the lock before we approached him [defendant]" and "By the time . . . our conversation was complete, the door had been opened. . . ."

From a reviewing court's standpoint, as I understand our duty, it appears well nigh indisputable by us that the defendant was the person described by the informer; that he personally had possession of the described premises; that those premises and the defendant and the automobile in which he arrived constituted real evidence which corroborated the in-

former's statements in all of those particulars. The further statement by the informer (*an admission against his personal interest* of a fact bearing a penal sanction, which type of admission does not require further substantiation to make it admissible (*People* v. *Spriggs* (1964) 60 Cal.2d 868, 870 [1a], 874 [3-1b], 875 [4] [36 Cal.Rptr. 841, 389 P.2d 377])) that he had unlawfully procured and injected heroin on the identified premises was corroborated by the fact that the informer was apprehended in the immediate vicinity in his car under the influence of a narcotic—not just any narcotic but an "opiate" which would include heroin. Certainly the search of defendant's premises after he had voluntarily opened the door thereto and had admitted that he was on parole as a narcotics felon, was incident to his clearly lawful arrest. The officers' procedure was in no way obnoxious to the rules recently reviewed and spelled out by us in *People* v. *Cruz* (1964) 61 Cal.2d 861, 865 [3] -866 [5] [40 Cal.Rptr. 841, 395 P.2d 889]. In my opinion the officers would have been derelict in their duty if they had not, in the circumstances then known to them (from the informer's statements, the defendant's statements, and their own observations) made the arrest of the parole violator and searched his premises. The contraband found in those premises was, of course, subject to seizure and, on the facts found, admissible against both the defendant and the informant.

The fact that the officers who made the search in the case at bench were not parole officers would seem to be quite unimportant. The acting officers had ample reason to believe that defendant was using or dealing in illegal narcotics and he himself, before the entry or search, volunteered the information that he was *on parole as a narcotics violator*. It is difficult for me to conceive of any evidence which could more convincingly corroborate all essential elements of the basic information theretofore furnished to the deputy sheriff by the informer. On this factual showing I view the acts of the officers as constituting intelligent and commendable law enforcement. They harmed no one; to the contrary their efficient action was protective and beneficial to the parolee addict himself, to the public, and particularly to the pitiable "sick" people the parole violator would otherwise have served with the illicit drug.

This case, as I view it, exemplifies the very type of alert, intelligent, and expeditious law enforcement which I should like to see this court be equally alert to support.

In these circumstances neither the *Cahan* nor any other

of the cited cases should be extended to immunize the illicit dealings of the admitted narcotics felon on parole.

I would affirm the judgment.

McComb, J., concurred.