[Crim. No. 10181.   In Bank.   Oct. 27, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. RUDOLPH LUJAN SANDOVAL, Defendant and Respondent.

Dahlstrum & Walton, Jack A. Dahlstrum and Richard A. Walton for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Walter R. Jones, Deputy Attorney General, for Plaintiff and Respondent.

TOBRINER, J.—Defendant appeals from a judgment of conviction for possession of heroin in violation of Health and Safety Code, section 11500. Defendant's sole contention is that the heroin found on his person should not have been admitted in evidence against him because of the unlawfulness of the search and his subsequent arrest. Defendant challenges the search and arrest on three alternative and independent grounds: first, that his apprehension constituted the fruit of an incriminating telephone message which the arresting officers intercepted by illegally entering and searching a certain residence; second, that the officers improperly relied upon the statement of a previously untested informer in concluding that defendant was the person who had telephoned the residence; and third, that the officers lacked authority to arrest and search defendant outside the city which employed them.

For reasons which we set forth hereinafter, we have con-

cluded that defendant's search and arrest should be upheld since the officers reasonably believed that persons inside the searched residence possessed heroin, the circumstances confronting the officers justified their reliance upon the informer's statement, and the officers retained their authority to arrest and search when their pursuit of defendant unexpectedly carried them beyond city limits.

The facts are substantially undisputed. Following a series of burglaries in Orange County, Officers Walker and Garrahan of the City of Los Angeles obtained warrants for the arrest of Oscar Jessie Coates and five other persons. The warrants were based on information obtained in part through an independent investigation and in part from a deputy district attorney; the deputy had been told that Coates concealed heroin and burglary loot in his house, that the house served as a narcotics headquarters, and that at least one narcotics "connection" normally contacted Coates there by telephone.

Shortly before noon on June 2, 1964, Officers Walker and Garrahan saw Coates, accompanied by a woman, leave his house and enter a car parked in the driveway. Pursuant to one of the warrants, the officers arrested Coates some 30 feet from his house. Officer Garrahan observed puncture marks on the woman's hand, arrested her, and found heroin in one of her pockets.

Both officers then went to Coates' house and knocked at the door. When a woman opened it and stepped back, they entered, identifying themselves and explaining their presence. They there saw two other persons and, in plain view on the floor, a plastic bag containing narcotics. After arresting all the occupants the officers proceeded to search the premises.

During the search the telephone rang; when Walker picked up the receiver, a voice asked, "Is this Jessie?" and Walker replied, "Yes." The caller said, "Man, where have you been? I've been waiting for you a long time. You were supposed to meet me some time ago." Officer Walker replied that he had been delayed and would be along in "about ten minutes." The caller then said, "Well, hurry up, man, I can't stand around with this stuff in my pocket on the street. I might get picked up." The conversation ended; Walker asked Coates what it meant. Coates explained that he had arranged to pick up an ounce of heroin from a tall Mexican named "Rudy," around 40 years old, weighing 190 to 200 pounds, with a heavy moustache, driving a white 1956 or 1957 Oldsmobile. Coates said that Rudy was waiting for him on the 6800 block on Albany Street.

■ The officers immediately went to the designated location. To their surprise, they found it was in Huntington Park, several blocks outside of the City of Los Angeles. There they saw defendant standing on the sidewalk near a 1956 white Oldsmobile. The record contains no description of defendant, but we must assume, in support of the judgment, that the defendant fit the description supplied by Coates. Officer Walker identified himself and, upon Walker's inquiry, defendant said that his name was Rudolph and that he had previously been arrested for narcotics offenses. He could only explain his presence at that particular location by saying that he was ''looking for a job'' and ''just walking around.'' The officers conducted a cursory search of defendant and, upon finding a condom containing heroin, arrested him. Defendant now disputes the ruling of the trial court permitting the introduction of that heroin in evidence.

We turn first to defendant's argument that the officers obtained the telephonic information after unlawfully entering and searching Coates' residence and that the heroin found on defendant's person should therefore have been excluded as the fruit of official illegality. ■ We hold that the entry and search of Coates' residence were lawful and that the telephonic information was not illegally obtained.

The entry and search, although not ''incidental'' to Coates' arrest,[1] could properly rest upon the officers' reasonable belief that persons in the residence were then committing a felony. The officers had been informed that Coates' house served both as a depository for burglarized loot and as a headquarters for an illicit narcotics trade. This information, although obtained from informers not known to be reliable, had already been corroborated in part by an independent investigation implicating Coates and five others in a burglary operation. Moreover, the officers had just discovered heroin on a woman whom they had seen leaving the premises with Coates. Under these circumstances, the officers could reasonably conclude that persons inside Coates' residence unlawfully possessed heroin. Since the officers therefore entered the premises lawfully (see People v. Diggs (1958) 161 Cal.App.2d 167, 171-172 [326 P.2d 194]), we need not decide whether the

---

[1]Since Coates was arrested outside his house, we could not sustain either the entry or the search which followed as lawful incidents of his arrest. (People v. Cruz (1964) 61 Cal.2d 861, 865-866 [40 Cal.Rptr. 841, 395 P.2d 889]; People v. Bustillos (1965) 237 Cal.App.2d 554, 558 [47 Cal.Rptr. 283]; People v. Martinez (1965) 232 Cal.App.2d 796, 800 [43 Cal.Rptr. 197].)

woman who opened the door and stepped back to admit the officers validly consented to their entry.

■ Soon after the officers entered, they observed narcotics in plain view and thereby acquired "reasonable cause to believe that [each of the occupants had] committed a public offense in [their] presence" (Pen. Code, § 836, subd. 1) as well as "reasonable cause to believe that [each occupant had] committed a felony" (Pen. Code, § 836, subd. 3). The officers were thus justified on either of two theories in arresting all of the occupants and in conducting a search of the premises incidental to such arrest. (See *In re Dixon* (1953) 41 Cal.2d 756, 761-762 [264 P.2d 513].)

■ Because the officers were engaged in a lawful search, and because the information supplied by the deputy district attorney rendered incoming telephone calls reasonably suspect, the officers could justifiably answer the telephone and conceal their identity from the caller in order to learn of possible unlawful activities. (See *People* v. *Malotte* (1956) 46 Cal.2d 59, 63-64 [292 P.2d 517].) The officers thus lawfully learned that the caller intended to deliver narcotics to Coates, and we therefore conclude that the heroin found on defendant did not constitute the fruit of illegally obtained information.

■ We consider, second, defendant's argument that the officers could not reasonably believe that he was the person whose voice Walker heard over Coates' telephone. We hold that the officers had acquired reasonable grounds to believe that the defendant telephoned Coates' residence and unlawfully possessed narcotics.

Although the officers acquired no information as to the caller's identity other than the statement made to them by Coates, who was at that time an informer of undetermined reliability, we must decide, not whether the information obtained by the officers emanated from a reliable source, but whether the officers could reasonably rely upon that information under the circumstances. (See *Willson* v. *Superior Court* (1956) 46 Cal.2d 291, 294-295 [294 P.2d 36].) In light of the facts confronting the officers when they apprehended the defendant, they could reasonably have relied upon the information which Coates had furnished.

First, the officers knew that a felony was presently being committed. The officers in other analogous cases (see, e.g., *People* v. *Gallegos* (1964) 62 Cal.2d 176 [41 Cal.Rptr. 590, 397 P.2d 174]; *People* v. *Tovar* (1966) 239 Cal.App.2d 644 [49 Cal.Rptr. 79]; *Ovalle* v. *Superior Court* (1962) 202 Cal.App.

2d 760 [21 Cal.Rptr. 385]; *People* v. *Amos* (1960) 181 Cal. App.2d 506 [5 Cal.Rptr. 451]) relied upon the statements of untested informers not only to furnish the identification of the supposed culprit but also to establish the fact that a crime had been committed. Here the conversation itself indicated that the caller was then committing various criminal offenses (possession of heroin, in violation of Health & Saf. Code, § 11500; possession of heroin for sale, in violation of Health & Saf. Code, § 11500.5; offering to sell, transfer, or deliver heroin, in violation of Health & Saf. Code, § 11501).

Second, the officers knew that their informer was aware of the identity and the whereabouts of the felon. The informer's conduct at the time of his arrest in starting to drive from his house accorded with his statement that he had arranged to meet the caller nearby; the content of the phone call presupposed such a prior arrangement; and the caller clearly assumed that the informer would know who he was and where and when to meet him. The information available to the informer thus rested on a foundation as firm as that of information gathered by an informer of unquestioned reliability.

Third, the officers had no reason to suppose that their informer was deliberately falsifying the information available to him. He had just been arrested, as had his female companion. He knew that his residence was being searched and that officers had already found narcotics there. He was aware that they had arrested his fellow occupants and had just answered a telephone call from a narcotics contact whom he was to have met. Under the circumstances, the officers could reasonably discount as unlikely the possibility that the informer not only selected defendant as a scapegoat to protect the identity of the true caller, but also managed, despite the unsettling character of the immediately preceding events, to contrive a fabrication which meshed perfectly with all of the surrounding circumstances.

Fourth, defendant's presence at the appointed location corroborated the informer's statement. In each case cited by defendant (*People* v. *Gallegos, supra,* 62 Cal.2d 176; *People* v. *Tovar, supra,* 239 Cal.App.2d 644; *People* v. *White* (1964) 231 Cal.App.2d 82 [41 Cal.Rptr. 604]; *Ovalle* v. *Superior Court, supra,* 202 Cal.App.2d 760; *People* v. *Amos, supra,* 181 Cal.App.2d 506) the police apprehended the suspect at a completely innocent location, on the basis of a "tip" which

anyone familiar with the suspect could have supplied.[2] The courts in these cases held only that the corroboration of this sort of "tip" does not warrant reliance upon other information supplied by the same informer. (See *People* v. *Gallegos, supra,* 62 Cal.2d 176, 179; *Willson* v. *Superior Court, supra,* 46 Cal.2d 291, 295.) In the present case, however, the fact that the defendant was waiting precisely where the informer told the officers they would find a man of his name and description, and the fact that an automobile of the make, year, and color described by the informer was parked nearby, cannot be dismissed as facts which anyone familiar with the defendant would have known or could have discovered. Although the informer might conceivably have pointed a finger of guilt at a wholly innocent citizen with a narcotics record[3] whose whereabouts he happened to know, the officers could reasonably conclude that he was neither the author of such a malicious scheme nor the possessor of such coincidentally useful information.

Fifth, defendant gave an inherently implausible explanation for his presence. If the defendant had been doing anything which would have taken him to the same block on Albany Street around noon each day, then the informer's ability to predict where the defendant would be at that hour on June 2, 1964, might have been understandable; but if the defendant had been "looking for a job" or "just walking around," as he claimed, then the informer's precise knowledge of where the defendant and his car could be located at that particular moment would have been inexplicable. Since the informer obviously possessed such knowledge, the officers could reasonably conclude that the defendant was *not* "just walking around" and was thus deliberately attempting to conceal his true purpose; that conclusion in itself constituted an additional basis for suspicion.

Sixth, the situation confronting the officers indicated the need for swift action. They could reasonably have concluded from the telephone message not only that the caller was presently committing a felony but also that he could not be expected to remain stationary for long. None of the other cases

---

[2] Gallegos was entering the door of his apartment; Tovar was waiting at an intersection where he usually caught a morning bus; White was in his apartment; Ovalle was inside his house; Amos was walking down the sidewalk after leaving his home.

[3] Unlike the defendant in *People* v. *Tovar, supra,* 239 Cal.App.2d 644, 646-647, the defendant in this case admitted prior narcotics arrests to the officers who apprehended him.

cited by defendant (*People* v. *Gallegos, supra,* 62 Cal.2d 176; *People* v. *Tovar, supra,* 239 Cal.App.2d 644; *People* v. *White, supra,* 231 Cal.App.2d 82; *Ovalle* v. *Superior Court, supra,* 202 Cal.App.2d 760; *People* v. *Amos, supra,* 181 Cal.App.2d 506) presented any analogous urgency. The officers in *Tovar* knew where the suspect could be found every morning; in the other four cases they knew where the suspects lived. Although the officers in the instant case could have initiated a surveillance after locating the suspect, they knew of no specific area where they could relocate him in the event that he managed to elude observance.

The officers in this case admittedly faced no "pressing emergency" of the kind which, without more, might warrant an arrest based exclusively upon uncorroborated information provided by an untested informer. (See *People* v. *Kilvington* (1894) 104 Cal. 86, 92-93 [37 P. 799, 43 Am.St.Rep. 73].) As we have seen, however, Officers Walker and Garrahan predicated their action upon far more than a wholly unconfirmed "tip." The exigencies of the situation confronting them, coupled with the other circumstances noted above, warranted their reliance upon the information provided by Coates. We thus conclude that, in searching defendant, the officers acted upon probable cause to believe that he unlawfully possessed heroin.[4]

■ We consider, third and finally, defendant's argument that his arrest and search in the City of Huntington Park cannot be sustained because the officers, both employed by the City of Los Angeles, could not act as "peace officers" (Pen. Code, §§ 817, 836) outside city limits.[5] We hold that the

---

[4]That the search itself preceded the formal arrest by several moments is of course immaterial. (See *People* v. *Cockrell* (1965) 63 Cal.2d 659, 666-667 [47 Cal.Rptr. 788, 408 P.2d 116]; *Willson* v. *Superior Court, supra,* 46 Cal.2d 291, 294.)

[5]If we were to agree that the officers in this case acted beyond their official authority in arresting defendant, we could not sustain the legality of the related search, for we would then be compelled to treat the instant arrest as a citizen's arrest. (Pen. Code, § 837; *People* v. *Martin* (1964) 225 Cal.App.2d 91, 94 [36 Cal.Rptr. 924]; *People* v. *Ball* (1958) 162 Cal. App.2d 465, 468 [328 P.2d 276].) A citizen effecting such an arrest is authorized only to "take from the person arrested all offensive weapons which he may have about his person" (Pen. Code, § 846), not to conduct a search for contraband "incidental" to the arrest, or to seize such contraband upon uncovering it. (See *People* v. *Martin, supra,* 225 Cal. App.2d 91, 94-95.) We reject the suggestion of *People* v. *Alvarado* (1962) 208 Cal.App.2d 629, 631 [25 Cal.Rptr. 437], that the search of one private individual or his premises by another is lawful simply because "incidental" to a lawful citizen's arrest.

officers here acted within the scope of their official authority under the generally recognized principle that an officer may pursue a suspected felon into another jurisdiction and may arrest him there so long as the arrest is otherwise lawful. (See, e.g., *People* v. *Martin, supra,* 225 Cal.App.2d 91, 93, fn. 2.)

In some states, the courts have suggested that this doctrine of "fresh pursuit" applies only to cases in which the suspect in fact commits a felony in the officer's municipality and then flees. (See, e.g., *Wilson* v. *Mooresville* (1942) 222 N.C. 283, 288 [22 S.E.2d 907]; see also *McCaslin* v. *McCord* (1906) 116 Tenn. 690, 709 [94 S.W. 79, 8 Ann.Cas. 245].) We can find no reason, either in the historical origins of the doctrine[6] or in its contemporary rationale,[7] to impose these limitations.

Although the defendant here had not attempted to flee, the officers possessed ample grounds to believe that he would elude them unless apprehended at once. (See p. 310, *supra.*) Moreover, although the defendant may not in fact have committed any felony within the City of Los Angeles,[8] Officer Walker was in the city when the defendant committed a "public offense in [his] presence" (Pen. Code, § 836, subd. 1).[9] Both officers reasonably believed, on the basis of Coates'

---

[6]The doctrine of fresh pursuit stems from the ancient "hue and cry," the "old common-law process of pursuing, with horn and with voice, all felons and such as have dangerously wounded another." (4 Blackstone's Commentaries, p. 294.) The "hue and cry" was not limited to persons who had in fact committed felonies within the village and had then fled: "*Hue* and *Cry* may be raised . . . by an officer of justice, . . . upon information of a felony. . . . The party that levies it ought to come to the constable of the vill, and give him notice of a felony committed, and give him such reasonable assurance thereof as the nature of the case will bear . . . [and] must describe his person, or his habit, or his horse, or such circumstances that he knows, which may conduce to his discovery. . . . The constable is to make search in his own vill. . . . He is to raise all the neighboring vills next about. . . . [I]f he should forbear his pursuit of the *hue* and *cry*, till it be examined by a justice of peace, the felon might escape, and the pursuit would be lost and fruitless." (2 Hale's Pleas of the Crown (1847 ed.) pp. 99-101.)

[7]Courts accept the doctrine today (see cases cited in 5 Am.Jur.2d, Arrest, § 51) because they recognize that to confront police officers in pursuit of suspected felons with archaic jurisdictional barriers would seriously impede effective law enforcement without advancing any legitimate interest, either private or public.

[8]Defendant's telephonic offer to deliver heroin constituted a violation of Health and Safety Code, section 11501, in the City of Huntington Park, from which the defendant telephoned that offer; we need not decide for present purposes whether defendant's offer *also* constituted a violation of section 11501 in the City of Los Angeles, where defendant's offer was received and where defendant intended that it be accepted.

[9]An officer acquires probable cause to believe that a public offense has been committed in his presence (justifying an arrest without a warrant under Pen. Code, § 836, subd. 1) when the person to whom the officer is speaking on the telephone makes a statement which reasonably indicates

statement that he was to meet the defendant nearby, that the defendant had called from, and was waiting at, a point within the city limits, thereby committing several felonies (violations of Health & Saf. Code, §§ 11500, 11500.5, 11501) in the City of Los Angeles. To hold that an officer's reasonable error as to *where* a felony has been committed renders the felon immune to arrest under section 836 of the Penal Code would be particularly anomalous in light of that section's express provision that a similar error as to *"whether or not* a felony has in fact been committed" (italics added) (Pen. Code, § 836, subd. 3) does *not* impair the officer's authority to arrest.

So long as officers reasonably believe, as did the officers in this case, that a felony has recently been committed within their jurisdiction and that the felon might escape unless promptly apprehended, we see no reason to hold that those officers should be stripped of their authority to arrest and search the moment their pursuit of the felon unexpectedly takes them across a jurisdictional boundary.[10] To insist, under such circumstances, that police officers must halt at the city's edge and wait for officers of the adjoining municipality to resume the chase, could only serve to transform every suburb into a criminal sanctuary. Accordingly, we conclude that the officers in this case were empowered to arrest and search defendant outside the City of Los Angeles.

We affirm the judgment of conviction.

Traynor, C. J., McComb, J., Peters, J., Peek, J., Mosk, J., and Burke, J., concurred.

---

that he has just committed, or is then committing, a felony. (See *People v. Bradley* (1957) 152 Cal.App.2d 527, 532 [314 P.2d 108], sustaining an arrest under Pen. Code, § 836, subd. 1, after the person to be arrested orally agreed to place a bet in accordance with the arresting officer's telephonic request.)

[10] If the 1965 amendment to Penal Code section 817 (Stats. 1965, ch. 2021, § 1, pp. 4585-4587) had been in effect when the defendant was arrested, that section would have authorized defendant's arrest even if the officers had not been in fresh pursuit, since the amendment provides that "The authority of a peace officer extends to any place in the state . . . as to a public offense . . . which there is probable cause to believe has been committed within the political subdivision that employs him. . . ." Since the 1965 amendment does not apply retroactively, however (Pen. Code, § 3), it cannot validate defendant's 1964 arrest.