[Crim. No. 11803. Second Dist., Div. Two. Aug. 21, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. EMIL JOHN CROVEDI et al., Defendants and Appellants.

Max Solomon and Burton Marks for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Philip M. Rosten, Deputy Attorney General, for Plaintiff and Respondent.

HERNDON, J.—Defendants Crovedi and Coletti appeal from the judgments entered against them following a nonjury trial that resulted in the conviction of Crovedi of burglary (Pen. Code, § 459), and Coletti of receiving stolen property (Pen. Code, § 496). Appellants make three basic assignments of error: (1) Property recovered as the result of illegal searches and seizures was improperly received in evidence against them; (2) evidence of another similar crime was improperly received; and (3) the evidence was insufficient to sustain their convictions. We hold that none of these contentions is valid.

The evidence in support of the judgments is without material conflict. On the morning of July 23, 1964, it was discovered that the Altobelli Jewelers in North Hollywood had been burglarized. The burglars had effected their entry by removing the cylinder from the lock on the front door of the premises adjoining the jewelers and thereafter opening an 18-inch hole in the wall dividing the two stores. Jewelry valued in excess of $10,000 had been stolen.

Officer Thomas Rogers of the Los Angeles Police Department investigated the burglary and observed that although the thieves had tampered with the doors on both stores, they had successfully removed the cylinder from the orifice of the lock on the door of the adjoining store leaving an indentation on the plate. Officer Rogers had been a police officer for 19 years and had worked the burglary detail for approximately 10 years but he had never seen this type of entry before, i.e., the complete removal of the cylinder of the lock.

On the afternoon of the 23d, Officer Rogers discussed the case with Sergeant Bishonden, also of the burglary detail. Sergeant Bishonden was then working on a case wherein an essentially identical *modus operandi* had been used in the burglary of a jewelry store in Bakersfield. Bishonden actually displayed the door frame[1] from the Bakersfield burglary to Officer Rogers and after the latter had examined it he found that "it fit the exact m.o." of the Altobelli burglary. Bishonden also informed Officer Rogers that two of the suspects in the Bakersfield jewelry theft were named Crovedi and Coletti

[1] The door frame was in the Los Angeles police laboratory for the purpose of expert examination.

and that they had been residing at the Sportsmen's Lodge, a motel located in the same neighborhood as the Altobelli Jewelry Store, when he had arrested them for the Bakersfield authorities.

The following day Officer Rogers was contacted by Agent Shaffer of the F.B.I. who advised him that he had received information from an informant that appellants had committed the Altobelli burglary and had the stolen jewelry with them. Officer Rogers obtained ''mug photos'' of appellants and went to the Sportsmen's Lodge where the manager identified appellant Crovedi as ''Mr. Mondagna,'' from Chicago, and appellant Coletti as a man known to him by the name of Roy who ''always comes over here to see Mr. Mondagna.''

Officer Rogers, accompanied by the motel manager, went to the room occupied by appellant Crovedi but found him absent. Although the manager opened the door to Crovedi's room and the officer either entered or looked therein, nothing was removed from the room nor was any testimony received concerning any observations that might have been made beyond the simple fact that appellant was not then present.

During the evening of the same day, the 24th, Officer Rogers received a call from the manager of the Sportsmen's Lodge advising him that appellant Crovedi had checked out and intended to fly to Chicago from the Los Angeles International Airport. Later Rogers was informed by the manager that both appellants in fact had left the Lodge and he was given a description and license number of their car. Observing the car parked in front of the Continental Airlines' office at the airport at about 12:30 a.m., Officer Rogers displayed appellants' pictures to the ticket salesman who informed him that Crovedi had just purchased a ticket for a 12:50 flight to Chicago

Officer Rogers immediately proceeded to the loading platform with the airlines manager where he observed both appellants and placed them under arrest. He took a baggage stub from Crovedi's hand and asked the manager to bring him the baggage to which the ticket referred. A few moments later the manager brought Officer Rogers a suitcase bearing a tag number corresponding with Crovedi's ticket. The suitcase was opened in the lobby of the airport and the officer observed a number of socks packed therein which felt as if they contained jewelry. Quite properly deciding that the public lobby was not an appropriate place either to hold two apparently professional criminals or to make a detailed inventory of

valuable jewelry, Officer Rogers took appellants and the suitcase to the police station. There the contents of the suitcase were examined in detail. Found therein were approximately 60 percent of the jewelry stolen in the Altobelli burglary and other personal effects bearing appellant Coletti's fingerprints.

Several months later on January 13, 1965, Officer Rogers executed a search warrant at an apartment occupied by a Mrs. Dorothy Martino. He seized a suitcase containing most of the Altobelli jewelry not previously recovered. A few additional pieces were found upon Mrs. Martino's dresser. She testified that Coletti had given her the suitcase some time before Thanksgiving in 1964, and had asked her to ''just put it away and keep it for me.'' She had done so and it had not been opened during the entire time she had had it in her possession. The few items of stolen jewelry found upon her dresser were given to her by Coletti from time to time as separate gifts. Various tools also were found in the suitcase Coletti had left with Mrs. Martino including a pair of pliers referred to as ''channel locks'' and a pair of ''nippers.''

William Lee, an expert with respect to locks and keys, testified that the lock cylinder extracted in the Bakersfield burglary had been removed in the same manner used in the instant burglary. He testified that in his opinion ''nippers'' had been used in each instance and the method of lock pulling was the same in both cases Further, although ''nippers'' were not a custom tool and could be purchased on the market, the ''nippers'' found in the suitcase were unusual in that they had been ground out at the tip. He believed that ''less than 20'' burglaries had been performed in the last 10 years by removing the cylinder and, in addition, the method of using nippers to draw the lock cylinder ''straight out'' was relatively new.

Contingent upon the court's finding the evidence admissible, counsel for appellant Crovedi stipulated that certain witnesses to the Bakersfield burglary would testify, if called, to certain facts, definitely linking Crovedi to this crime.

That appellants' arrest, and the search conducted incident thereto, was proper in every respect is beyond serious question. ''Reasonable cause exists when the facts and circumstances within the knowledge of the officer '. . . at the moment of the arrest would ''warrant a man of reasonable caution in the belief'' that an offense had been committed. [Citation.]' [Citation.] In *Brinegar* v. *United States* (1949) 338 U.S. 160, 176 [93 L.Ed. 1879, 60 S.Ct. 1302], the court stated: 'The rule of probable cause is a

practical, non-technical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.' " (*People* v. *Schader*, 62 Cal.2d 716, 722 [44 Cal.Rptr. 193, 401 P.2d 665].)

 Officer Rogers knew from his own personal observation and experience that the perpetrators of this burglary had used the identical and highly unusual method adopted a short time earlier in another jewelry store burglary. When a person who had been arrested in connection with the earlier case was found to be registered under a false name at a motel a short distance from the site of the instant burglary and who was "always" being visited by another suspect in the prior burglary, Officer Rogers quite properly formed the reasonable belief that these men were connected with the instant crime. The fact that the informant whose tip was relayed to Officer Rogers by F.B.I. Agent Shaffer was not identified and his reliability was not established is of little consequence since the reasonable suspicion already aroused in the mind of Officer Rogers as the result of his own independent investigation was well founded.

Also not to be overlooked is the fact that when Officer Rogers learned of appellants' impending departure from the jurisdiction, his opportunity for further investigation ceased and immediate action was required. As aptly stated in *People* v. *Sandoval*, 65 Cal.2d 303, 310-311 [54 Cal.Rptr. 123, 419 P.2d 187]:

". . . [T]he situation confronting the officers indicated the need for swift action. They could reasonably have concluded from the telephone message not only that the caller was presently committing a felony but also that he could not be expected to remain stationary for long . . .

"The officers in this case admittedly faced no 'pressing emergency' of the kind which, without more, might warrant an arrest based exclusively upon uncorroborated information provided by an untested informer. [Citation.] As we have seen, however, Officers Walker and Garrahan predicated their action *upon far more than a wholly unconfirmed 'tip.'* The exigencies of the situation confronting them, coupled with the other circumstances noted above, warranted their reliance upon the information provided by [a previously untested informant]."

■ The officer's actions in obtaining the baggage represented by the ticket found in appellant Crovedi's possession, in making a general inspection at the airport and in making a detailed inspection at the police station were properly incident to, and in every realistic sense were contemporaneous with, appellants' arrest.

Turning to the search of January 13, 1965, appellants made no objection during the trial to the sufficiency of the affidavit supporting the search warrant issued herein. In the trial court they urged only that the warrant itself was void because it failed to describe with sufficient particularity the things to be seized and therefore constituted the "general warrant" condemned in *Stanford* v. *Texas,* 379 U.S. 476, 480 [13 L.Ed.2d 431, 85 S Ct. 506].

Since the warrant here involved specifically authorized the seizure of "gems, mountings for gems, costume jewelry, women's apparel and burglary tools," it placed "a meaningful restriction on the objects to be seized." (*People* v. *Barthel,* 231 Cal.App.2d 827, 832 [42 Cal.Rptr. 290]; *People* v. *McEwen,* 244 Cal.App.2d 534, 536 [53 Cal.Rptr. 362].) Appellants properly have not urged this contention on appeal.

Assuming that the recent decision in *People* v. *Butler,* 64 Cal.2d 842 [52 Cal.Rptr 4, 415 P.2d 819], authorizing the challenge of affidavits supporting the issuance of search warrants at the time of trial, although no prior challenges have been made in accordance with Penal Code sections 1539 and 1540, constituted a sufficient change in the law to permit this contention to be raised for the first time on appeal (cf. *People* v. *Hillery,* 62 Cal.2d 692, 711 [44 Cal.Rptr. 30, 401 P.2d 382]; *People* v. *Kitchens,* 46 Cal.2d 260, 262-263 [294 P.2d 17]), nevertheless the contention would not be well taken.

■ The instant affidavit sets forth in detail the events heretofore described which preceded and culminated in appellants' arrest and search at the airport. These events, of course, had completely verified the prior information given by the F.B.I.'s informant concerning appellants' perpetration of the instant crimes and their anticipated return to Chicago. The informant's reliability thus having been affirmatively established, it was entirely proper for the court issuing the warrant to accept his further statements concerning the presence of the loot in the apartment occupied by Dorothy Martino without demanding disclosure of his identity.

The affidavit indicated that Coletti and a woman known as "Dotty" occupied the specified apartment and she had been

seen wearing certain items of stolen property. The officers had verified that a woman known as "D. Martino" resided at the designated residence. Under such circumstances it was unnecessary to identify the informant either in the affidavit or at the time of trial. (*Aguilar* v. *Texas*, 378 U.S. 108, 114 [12 L.Ed.2d 723, 84 S.Ct. 1509]; *People* v. *Keener*, 55 Cal.2d 714, 723 [12 Cal.Rptr. 859, 361 P.2d 587].) The practical considerations which require and justify the applicable rules are well set forth in the recent United States Supreme Court decision, *McCray* v. *Illinois*, 386 U.S 300 [18 L.Ed.2d 62, 68, 87 S.Ct. 1056], where the following reasoning from *State* v. *Burnett*, 42 N.J. 377 [201 A.2d 39, 43], was quoted with approval:

"If a defendant may insist upon disclosure of the informant in order to test the truth of the officer's statement that there is an informant or as to what the informant related or as to the informant's reliability, we can be sure that every defendant will demand disclosure. He has nothing to lose and the prize may be suppression of damaging evidence if the State cannot afford to reveal its source, as is so often the case. And since there is no way to test the good faith of a defendant who presses the demand, we must assume the routine demand would have to be routinely granted. The result would be that the State could use the informant's information only as a lead and could search only if it could gather adequate evidence of probable cause apart from the informant's data. Perhaps that approach would sharpen investigatorial techniques, but we doubt that there would be enough talent and time to cope with crime upon that basis. Rather we accept the premise that the informer is a vital part of society's defensive arsenal. The basic rule protecting his identity rests upon that belief.

" . . . . . . . . . . . . . .

"We must remember also that we are not dealing with the trial of the criminal charge itself. There the need for a truthful verdict outweighs society's need for the informer privilege. *Here, however, the accused seeks to avoid the truth. The very purpose of a motion to suppress is to escape the inculpatory thrust of evidence in hand, not because its probative force is diluted in the least by the mode of seizure,* but rather as a sanction to compel enforcement officers to respect the constitutional security of all of us under the Fourth Amendment. *State* v. *Smith* (1962) 37 N.J. 481, 486 [181 A.2d 761].

*If the motion to suppress is denied, defendant will still be judged upon the untarnished truth.''* (Italics added.)

[5a] The contention that prejudicial error was committed when evidence concerning appellant Crovedi's participation in the similar Bakersfield burglary was received in evidence is unmeritorious. As recently restated in *People* v. *Perez,* 65 Cal.2d 615, 618-619 [55 Cal.Rptr. 909, 422 P.2d 597]:

'' 'It is settled in this state that except when it shows merely criminal disposition, evidence which tends logically and by reasonable inference to establish any fact material for the prosecution, or to overcome any material fact sought to be proved by the defense, is admissible although it may connect the accused with an offense not included in the charge.' [Citations.] Here the evidence of the prior robbery was relevant on the issue of the identity of defendant as a perpetrator of the robberies charged. The evidence of the prior robbery disclosed a plan, pattern, and *modus operandi* similar in many respects to those used in the robberies charged. In the prior offense, as in each of the offenses charged, the place robbed was a business establishment in Sacramento, the robbery was committed during the evening or early morning hours, two or three men participated in the robbery, one or more of the robbers wore a mask, a gun was used in committing the robbery, and no victim was physically injured. It further appears that in the prior robbery and all the robberies charged, except those at Ralph's Bar, property in addition to money was taken, that the Bankamericard taken in the Viking Club robbery was later used by defendant, and that the money orders taken at the prior robbery were likewise later used apparently by one of the robbers.

"In view of the striking similarities between the prior offense and the ones charged we are satisfied that the trial court did not abuse its discretion in admitting the evidence. [Citations.] There were factual differences between the prior robbery and the ones charged, such as that at the robberies at the Viking Club and Ralph's Bar, unlike the prior robbery, the victims were made to lie on the floor, but it was, of course, unnecessary to prove the prior offense identical in every detail with the crimes charged in order to render evidence of the prior offense admissible. [Citations.]''

The similarities between the two burglaries in the instant case were abundantly sufficient to satisfy the common features test. The two burglaries were clearly the work of professional jewelry thieves and the method adopted in each

instance was so rare that even the expert locksmith could think of "no more than 20 cases" following this pattern in the past decade.

The evidence to sustain each appellant's conviction is manifestly adequate and in actuality presents nothing properly falling within the scope of appellate review. The inferences to be drawn from the possession of recently stolen property, the transportation of such valuable merchandise inside socks in a suitcase, the possession thereafter established of the remainder of the stolen property together with tools particularly designed to effectuate the commission of the crime here committed amply support the conclusions drawn by the trier of the fact. (*People* v. *McFarland*, 58 Cal.2d 748, 754 [26 Cal.Rptr. 473, 376 P.2d 449] ; *People* v. *Robinson*, 184 Cal.App.2d 69, 76 [7 Cal.Rptr. 202] ; *People* v. *Barnes*, 210 Cal.App.2d 740, 745 [26 Cal.Rptr. 793] ; *People* v. *Bugg*, 204 Cal.App.2d 811, 816-817 [22 Cal.Rptr. 896].)

The judgments are affirmed.

Roth, P. J., and Fleming, J., concurred.