2 Cal.App.3d 230 (1969)
82 Cal. Rptr. 561
THE PEOPLE, Plaintiff and Respondent,
v.
ARMON LEON DAVIS, Defendant and Appellant.
Docket No. 16288.
Court of Appeals of California, Second District, Division One.
December 3, 1969.
*232 COUNSEL
Jesse L. Halpern, under appointment by the Court of Appeal, for Defendant and Appellant.
Thomas C. Lynch, Attorney General, Elizabeth Miller and Lawrence K. Keethe, Deputy Attorneys General, for Plaintiff and Respondent.
*233 OPINION
LILLIE, J.
Defendant was charged with robbery (§ 211, Pen. Code) and violation, Dangerous Weapons Control Law (§ 12020, Pen. Code). His motions under sections 995 and 1538.5, Penal Code, were denied. The court found defendant guilty as charged and fixed the degree of the robbery at first degree but made no finding on the allegation that defendant had suffered two prior felony convictions (grand theft and violation, Dyer Act). He appeals from the judgment.
Around 3 p.m. on May 30, 1968, defendant entered a liquor store and pointing a shotgun at Herman Goldberg, ordered him to give him the money; Goldberg was seven to eight feet from defendant who was wearing a blue jacket. He opened the cash register and gave defendant over $300, then defendant demanded a wallet from a man who had entered the store; the man started to fight defendant and Goldberg ran out crying for help. Defendant drove away in a 1958 or 1959 black Chevrolet Convertible; Goldberg gave the first three letters of the license plate (FZE) to police, and a girl who arrived just as defendant departed got the rest of the license number for the officers.
Upon reading the robbery report, Officer Hambly recognized the license of the car (FZE 449) as connected with the arrest of James Morgan in April 1968, thus on May 30, 1968, he caused a bulletin to be circulated within the police department asking that the car be stopped and any occupants held for investigation on the robbery. On June 1 Morgan and Eddy Potter were apprehended in the vehicle. Officer Hambly advised Morgan of his constitutional rights; Morgan told him that on the evening of May 29 he loaned the car to Potter who was to return it within about 30 hours, when the car was not returned he went to look for it and found it parked near 6th and Union Drive. After Officer Hambly advised Potter of his constitutional rights, Potter told him he borrowed the car from Morgan and drove to 508 Union Drive (near 6th and Union) where he met others including Steve Cassidy and "Pete" in apartment 209; he, "Pete" and Cassidy had a party there which lasted through the evening until the next day; he became so intoxicated he could not say what happened to the car during that time but Cassidy had the key. Potter described "Pete" as tall and slender  approximately 6 feet 2, weighing 170 pounds and having sandy brown crewcut hair.
On June 3, Officers Hambly and Patterson knocked on apartment 209; defendant answered. Officer Hambly asked if Steve was there; defendant said, "No"; then they identified themselves as police officers and asked if they could come in and look; defendant said they could and stepped back from the door; after the officers entered, Officer Hambly asked defendant *234 his name; he answered, "`Bill James' or something like that"; asked for identification, defendant said he lost his wallet and did not have any; Officer Hambly showed him a photograph of "Steve" and asked if he knew the man; defendant said, "Yes, that's Steve. I know him. He used to stay here, but he isn't staying here any longer"; then Officer Hambly asked if he (defendant) rented the apartment and defendant said he did under the name of "Pete Davis." Because he knew that a man named "Pete" was with Potter in the period during which the automobile was seen at the robbery and because defendant fit the general description of one of the robbery suspects, Officer Hambly arrested him for robbery. After advising him of his constitutional rights the officers searched the apartment and found a blue jacket with 15 shotgun shells in a pocket and a shotgun wrapped in brown paper on a shelf over the pole on which the jacket was hanging. At the police building Officer Hambly informed defendant he was certain he was responsible for a number of holdups, then asked if he would object to appearing in a lineup for the purpose of trying to establish whether he was a suspect in the Goldberg robbery; defendant said, "No. Go ahead"; that evening Goldberg identified defendant from the lineup. Later Officer Hambly went to the liquor store and showed Goldberg two photographs and asked if he could identify the robber; Goldberg selected defendant's photograph as "the one who held me up"; there was no writing on the photographs and the officer said nothing to him when he showed them.
On June 4 the officer talked to defendant and asked him if he recalled being admonished of his constitutional rights the day he was arrested and defendant said that he did; he continued, "Well, understanding these things, do you want to discuss with me this case of robbery?" and defendant said, "Yes," but "How many cases did you make on me?" the officer replied "Well, would you go for two?" and defendant said, "Which ones?"; he asked defendant if he would go for the robbery on May 30 and defendant replied, "Okay." Then he asked defendant about the shotgun and defendant said a friend who occupied the apartment before him brought it to the apartment and he had used it in the robbery; when asked if the blue jacket he was then wearing was the same he wore during the robbery defendant said it was; he asked if there was anything else he would like to tell concerning the robbery and defendant said he and a couple of others had gone to the store in the black Chevrolet Convertible and he went in alone with the shotgun and held it up; he was kind of drunk and mixed up and did not know how much money he got, he returned to the car and they drove away. Asked if he had any difficulty in the store, defendant replied some drunk or somebody came sticking his nose in and got in the way.
Defendant neither testified nor offered a defense.
(1a) In support of his contention that there was not probable cause *235 for his arrest thus the jacket, shotgun and his statements were inadmissible, appellant argues that the officers acted only on information obtained from Potter whose reliability was unknown to the police and on a description in the crime report, the source of which was unknown to Officer Hambly.
(2) "A peace officer may arrest a person without a warrant whenever he has reasonable cause to believe that the person whom he arrested has committed a felony. Reasonable or probable cause exists when the facts and circumstances within the knowledge of the officer at the moment of the arrest are sufficient to warrant a prudent man in believing that the defendant has committed an offense. (People v. Talley, 65 Cal.2d 830, 835-836 [56 Cal. Rptr. 492, 423 P.2d 564].)" (People v. Hogan, 71 Cal.2d 888, 890 [80 Cal. Rptr. 28, 457 P.2d 868]; People v. Lara, 67 Cal.2d 365, 374 [62 Cal. Rptr. 586, 432 P.2d. 202]; People v. Schader, 62 Cal.2d 716, 722 [44 Cal. Rptr. 193, 401 P.2d 665].) (3) "Each case must be decided on its own facts and circumstances [citations]." (People v. Ingle, 53 Cal.2d 407, 412 [2 Cal. Rptr. 14, 348 P.2d 577].) (4) "In reviewing the trial court's finding on this question we must bear in mind that the rule allowing the trial court to determine the credibility of witnesses and the weight of their evidence is applicable, and that we must accept all evidence and all reasonable inferences therefrom in support of the lower court's ruling." (People v. Shapiro, 213 Cal. App.2d 618, 620 [28 Cal. Rptr. 907].) (5a) After a full hearing of the matter the trial court found the officers had probable cause, and there is sufficient evidence to support its determination. (People v. Lara, 67 Cal.2d 365, 374 [62 Cal. Rptr. 586, 432 P.2d 202].)
(6) Information obtained from others may be relied upon to show probable cause. (7) Although information provided by a known informant of unproved reliability or by an anonymous informer ordinarily is not alone sufficient to warrant an arrest, it is sufficient if it is corroborated in essential respects by such other facts, sources or circumstances as would justify the conclusion that reliance on the information was reasonable. (People v. Talley, 65 Cal.2d 830, 835-836 [56 Cal. Rptr. 492, 423 P.2d 564]; People v. Gallegos, 62 Cal.2d 176, 179 [41 Cal. Rptr. 590, 397 P.2d 174]; People v. Reeves, 61 Cal.2d 268, 273-274 [38 Cal. Rptr. 1, 391 P.2d 393]; Willson v. Superior Court, 46 Cal.2d 291, 294 [294 P.2d 36].) (8) "Such corroboration need not itself amount to reasonable cause to arrest; its only purpose is to provide the element of `reliability' missing when the police have had no prior experience with the informant. Accordingly, it is enough if it gives the officers reasonable grounds to believe the *236 informant is telling the truth, for in this type of case the issue is `not whether the information obtained by the officers emanated from a reliable source, but whether the officers could reasonably rely upon that information under the circumstances.' [Citations.]" (People v. Lara, 67 Cal.2d 365, 374-375 [62 Cal. Rptr. 586, 432 P.2d 202].)
(5b) The information obtained from Potter was sufficiently corroborated to warrant the officers' reliance thereon. Immediately after the robbery Goldberg gave police the first three letters of the license plate of the get-away car (the three numerals were supplied by another witness) and a description of the robber.[1] Upon reading the robbery report[2] Officer Hambly recognized the license number as one he had previously dealt with in the arrest of James Morgan in April 1968, and circulated a bulletin in the police department asking that the car be stopped. Two days later Morgan and Potter were apprehended in the vehicle. Morgan told him that on May 29, 1968, he loaned the car to Potter who was to return it within 30 hours but Potter did not do so and he went out to look for the car finding it near 6th and Union. Potter then told Officer Hambly that be borrowed the car from Morgan on May 29 and drove it to 508 Union Drive near 6th and Union; there he met others, including Steve Cassidy and "Pete" in apartment 209 where they had a party that evening and the next day; he became so intoxicated he passed out and could not say what happened to the car during that time but that Steve Cassidy had the keys. Pursuant to this information the officers went to apartment 209 where Potter said he had been on the day of the robbery with Cassidy and "Pete," and found "Pete" who first identified himself as "Bill James," identified a photograph of Cassidy as someone who used to stay there, admitted he rented the apartment under the name of "Pete Davis" and matched the general description in the robbery report. Asked what happened that convinced him defendant was the man he was looking for, Officer Hambly testified, "Well, two things: number one is that at that point he identified himself as Pete, which was the name I had received from this other man, Potter, as being one of the men who was with him during this period, this critical period when the car was seen on this robbery. Number two was I *237 was able then to better judge his physical size after I had a chance to better look at him than I did just through the open door; and I determined that by his size, color of his hair, et cetera, that he fit the general description of one of these robbery suspects" His further testimony refers to descriptions in the crime report[3] and that obtained from Potter,[4] and other information that "there were other robberies pulled by a tall, slender, dark-haired suspect.
(1b) In our opinion Potter's information was sufficiently corroborated so that reliance thereon by the officer was reasonable (People v. Lara, 67 Cal.2d 365, 375 [62 Cal. Rptr. 586, 432 P.2d 202]; People v. Sandoval, 65 Cal.2d 303, 308-309 [54 Cal. Rptr. 123, 419 P.2d 187]), and the trial court's determination that the search was valid as incident to a lawful arrest (People v. Berutko, 71 Cal.2d 84, 94 [77 Cal. Rptr. 217, 453 P.2d 721]; People v. Ross, 67 Cal.2d 64, 69 [60 Cal. Rptr. 254, 429 P.2d 606]; People v. Cockrell, 63 Cal.2d 659, 666 [47 Cal. Rptr. 788, 408 P.2d 116]) was proper. (9) Chimel v. California, 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034], limiting the scope of searches incident to an arrest, is not here applicable inasmuch as the trial of the cause was had seven months before the effective date of Chimel (June 23, 1969). People v. Groves, 71 Cal.2d 1196, 1199 [80 Cal. Rptr. 745, 458 P.2d 985]; People v. Edwards, 71 Cal.2d 1096, 1107 [80 Cal. Rptr. 633, 458 P.2d 713].
The record shows that defendant was not advised of his right to have counsel present at the lineup. (United States v. Wade, 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926].) However, in the light of the overwhelming evidence pointing to defendant's guilt, we can only conclude that the prosecution has proved "beyond a reasonable doubt that the error complained of" did not contribute to defendant's conviction. (Chapman v. California, 286 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065].) (10) Appellant's claim that the lineup was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law is without substance. On the evening of the day he was arrested defendant was in a lineup of eight men all of whom were wearing blue jackets similar to the one defendant wore when he robbed the liquor store; defendant was at the end and the tallest; *238 none of those viewing the lineup said anything or pointed indicating which man was a suspect; police officers present during the lineup said nothing to Goldberg while he was looking at the men and Goldberg stood 12 to 15 feet away. Even though defendant may have been taller and at the end of the line, under the foregoing circumstances defendant was not "singularly marked for identification" within the meaning of People v. Caruso, 68 Cal.2d 183, 187 [65 Cal. Rptr. 336, 436 P.2d 336], and the lineup was not "unnecessarily suggestive and conducive to irreparable mistaken identification" within the meaning of Stovall v. Denno, 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967]. (People v. Daniels, 71 Cal.2d 1119, 1142-1143 [80 Cal. Rptr. 897, 459 P.2d 225]; People v. Terry, 70 Cal.2d 410, 423 [77 Cal. Rptr. 460, 454 P.2d 36]; People v. Beivelman, 70 Cal.2d 60, 77 [73 Cal. Rptr. 521, 447 P.2d 913]; People v. Feggans, 67 Cal.2d 444, 448 [62 Cal. Rptr. 419, 432 P.2d 21].)
The record, however, shows by "clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification." (United States v. Wade, 388 U.S. 218, 240 [18 L.Ed.2d 1149, 1164, 87 S.Ct. 1926].) Goldberg testified that at times defendant was only seven or eight feet from him and he observed him in the course of the robbery which lasted five or six minutes. In the courtroom he identified defendant as the man who robbed him based on his observations of defendant during the robbery independent of any identification of defendant in the lineup. The record affirmatively shows that Goldberg's in-court identification was not based on his recollection of defendant at the lineup.[5] (See In re Hill, 71 Cal.2d 997, 1006-1007 [80 Cal. Rptr. 537, 458 P.2d 449].)
The judgment is affirmed.
Wood, P.J., and Thompson, J., concurred.
A petition for a rehearing was denied December 22, 1969.
NOTES
[1] Information from a victim may be sufficient even though his reliability has not been previously tested. (People v. Hogan, 71 Cal.2d 888, 890 [80 Cal. Rptr. 28, 457 P.2d 868].)
[2] Reliable information furnishing probable cause for an arrest does not lose its reliability when it is transmitted through official channels to arresting officers. The latter may rely upon it when making an arrest. (People v. Ross, 67 Cal.2d 64, 70 [60 Cal. Rptr. 254, 429 P.2d 606] [reversed on other grounds, 391 U.S. 470 (20 L.Ed.2d 750, 88 S.Ct. 1850)]; People v. Hogan, 71 Cal.2d 888, 891 [80 Cal. Rptr. 28, 457 P.2d 868].)
[3] Officer Hambly described the description in the crime report as "a composite description as perhaps provided by all of the listed witnesses as well as the reporting party [Goldberg], that this is generally the way they described them, and the officer made that composite description on there from the information he learned from those people."
[4] Potter described Pete as a male Caucasian, tall and thin, about 6 feet 2, 170 pounds with dark hair in a crewcut.
[5] "THE COURT: And you are identifying him again today as the person who robbed you; is that right?

"THE WITNESS: Yes.
"THE COURT: Is this identification based on your recollection of the person who robbed you?
"THE WITNESS: Yes.
".... .... .... .... .... . .
"THE COURT: Mr. Goldberg, are you saying that this man is the man who robbed you merely because you saw him in a line-up, or are you saying he is the one that robbed you because you remember that he was the person who robbed you?
A. I remember it was the person who robbed me."