[Crim. No. 17581. Second Dist., Div. Five. Sept. 22, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
MAX MORTON GOLDEN, Defendant and Appellant.

212

---

COUNSEL

Harrison W. Hertzberg and Bennett B. Cohon for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Kenneth C. Young, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**STEPHENS, J.** — By information, defendant was charged with burglary (Pen. Code, § 459), receiving stolen property (Pen. Code, § 496), and possession of obscene matter with intent to distribute (Pen. Code, § 311.2). After a court trial, he was acquitted on all counts except the last. He was sentenced to 60 days in the county jail, and appealed.

On March 13, 1968, a search warrant was issued on the basis of an affidavit by Sergeant Shaidell, a 14-year veteran with the Los Angeles Police Department. Three and one-half of those years were spent in the administrative vice division of the department. In February 1968, Shaidell received information from the Federal Bureau of Investigation that it had been told by a reliable informant that defendant was selling obscene films and possibly "Tijuana Bibles"[1] from the back of his car. Officer Shaidell was also informed that these sales were taking place on Main Street, or in the area surrounding Main Street, in downtown Los Angeles and also in various other locations throughout the City of Los Angeles, and that defendant was living at 508 North Orange Drive, Los Angeles. On March 12, 1968, after procuring a photograph of defendant, Shaidell placed the residence at 508 North Orange Drive under surveillance. He saw defendant enter and leave the premises several times. A 1961 Lincoln was parked in the driveway. At 8:45 p.m., defendant came out of the house carrying a box, which he put in the trunk of the Lincoln. He then drove to a gas station at 8873 Sunset Boulevard and purchased gas from Ray, an attendant. He had a conversation with Ray, after which he moved the car from the gas pump to the entrance to the lubrication rack. Defendant opened the trunk of the Lincoln. Ray reached inside and rummaged through a box in the trunk; he left to wait on customers, and then returned to the Lincoln and removed four reels of eight millimeter film from the trunk. (We now quote verbatim from Sergeant Shaidell's affidavit): "At this time Officer Monnett stationed himself approximately five feet from the rear of the vehicle and next to a Coke machine, from where he overheard a conversation between Golden and Ray. The conversation was not heard in its entirety; however, the substance of it is as

---

[1] See *infra* for explanation.

follows: Golden—'We'll have to jack these guys up to get 20 to 30 different films although these films are good. They show a lot of fuck action. Ray, I will see you later.' " The next event was witnessed by Shaidell personally. It consisted of Ray handing some money to defendant and saying: "All right." Defendant then got into his car and left the location. He was followed by Monnett. Shaidell remained at the station and saw Ray walk into the interior-storage area, where he put the four reels of film into a box and covered them with rags. According to another statement in Shaidell's affidavit, Monnett followed defendant to a restaurant in the 8600 block of Sunset Boulevard, where he had a short conversation with a waitress; defendant then returned to 508 North Orange Drive, where he remained until Monnett terminated the surveillance at 12:30 a.m.

Based on these facts, Sergeant Shaidell stated in his affidavit for warrant that he had reasonable and probable cause to believe that in defendant's automobile and at his home there were ". . . motion picture films depicting acts of sexual intercourse, masturbation, sodomy, beastiality [*sic*], and oral copulation; booklets, commonly known to your affiant as "Tijuana Bibles, which depict in writing and photograph and drawing acts of sexual intercourse, sodomy, masturbation, beastiality [*sic*], and oral copulation." The warrant itself used identical phraseology. It was executed at defendant's home the next day.

During the trial, defendant, after having first denied his intent to distribute or sell the films and other items, subsequently recanted his testimony and stated that he did, in fact, intend to sell some of the films.

Defendant makes two contentions on appeal: (1) Penal Code section 311.2 is unconstitutional on its face and as applied herein; (2) the search warrant was issued in violation of defendant's constitutional rights.[2]

■ Defendant's first contention has been answered in *United States* v. *Reidel,* 402 U.S. 351 [28 L.Ed.2d 813, 91 S.Ct. 1410] and *People* v. *Luros,* 4 Cal.3d 84 [92 Cal.Rptr. 833, 480 P.2d 633]. *Reidel,* in essence, provides that the constitutional right of a person to possess obscene material in the privacy of his own home does not confer on another a First Amendment right to sell and deliver such material. The states retain broad powers to regulate obscenity. In *Luros* (at p. 93), which preceded *Reidel,* our State Supreme Court found that *"Stanley* [v. *Georgia,* 394 U.S. 557 (22 L.Ed.2d 542, 89 S.Ct. 1243)], as the Supreme Court expressly stated, does not impair *Roth* [v. *United States,* 354 U.S. 476, 477 (1 L.Ed.2d 1498, 77 S.Ct. 1304)] and the cases following it. States retain broad power to

---

[2]On appeal, defendant has not seen fit to challenge either the breadth of the warrant or the manner of its execution.

regulate obscenity, and regulation of the public distribution of obscenity falls well within the broad scope of that power." Defendant's contention therefore fails.

Defendant's second contention, which is presented as the more substantial problem before us, attacks the validity of the search warrant. He bases his claim on the lack of prior adversary hearing and upon the legal insufficiency of the affidavit supporting the warrant due to an alleged absence of probable cause. It is true that there was no adversary hearing prior to the issuance of the search warrant. However, we believe that in the instant case no prior adversary hearing was required. (*People* v. *Luros, supra; Monica Theatre* v. *Municipal Court,* 9 Cal.App.3d 1 [88 Cal.Rptr. 71].) ■ We have no argument with the fact that when the First Amendment is involved, more restrictive rules prevail with respect to a search (see *Flack* v. *Municipal Court,* 66 Cal.2d 981, 991 [59 Cal.Rptr. 873, 429 P.2d 192]), "and the ordinary rules of search and seizure are inapplicable." (*Flack,* at p. 989.) Defendant relies on *Quantity of Books* v. *Kansas,* 378 U.S. 205 [12 L.Ed.2d 809, 84 S.Ct. 1723] and *Demich, Inc.* v. *Ferdon* (9th Cir. 1970) 426 F.2d 643[3] for the proposition that a prior adversary hearing is an absolute requirement. The argument misses the point, for here the obscenity factor was established by defendant's out of court admission. Even a prior adversary hearing before the issuing magistrate does no more than establish the factor of probable cause for the warrant. It does not establish the *fact* of obscenity itself, or there would be no need for the trial. The admission of defendant, in the light of the other known facts, established the necessary element as clearly as would have the adversary hearing. The cases relied upon by defendant are concerned with the means of establishing the factor of obscenity and the identification of the items to be seized. In our understanding (and obviously in the understanding of the officer and the magistrate) of defendant's statement, neither factor is left in issue. More to the crux of the problem is the fact that the United States Supreme Court, after *Demich,* in *Reidel, supra,* reaffirmed *Roth, supra* and the fact that obscenity is not within the area of constitutionally protected speech or press. *Reidel* (402 U.S. 351, 356 [28 L.Ed.2d 813, 817]) went on to say: "It [*Stanley* v. *Georgia, supra*] does not require that we fashion or recognize a constitutional right in people like Reidel to distribute or sell obscene materials." At 402 U.S. 351, 356 [28 L.Ed.2d 813, 818], the court reiterated: "*Roth* has squarely placed obscenity and its distribution outside the reach of the First Amendment and they remain there today." We therefore conclude that in the instant

---

[3]On March 29, 1971, the United States Supreme Court vacated the Ninth Circuit Court of Appeals affirmance of the *Demich* case.

case involving distribution and sale of obscenity, the First Amendment is not involved. If we were to assume that the First Amendment is indeed involved, the ordinary rules of search and seizure are not applicable. But this does not mean that a search warrant will only issue when there has been a prior adversary hearing. We believe that what is required is merely a *stronger* showing of probable cause before a magistrate may issue the search warrant. One method for establishing probable cause is obviously by way of a prior adversary hearing, but this need not be the only method. In the recent case of *People* v. *Luros, supra,* 4 Cal.3d 84, 88, our Supreme Court reiterated: " 'Where, as here, the seizure occurs under a warrant, an ex parte determination of the issue of obscenity, *so far as probable cause is concerned,* has taken place before issuance of the warrant, and immediately after the seizure a determination of the issue to that extent can be obtained in adversary proceedings by controverting the warrant under sections 1539 and 1540 of the Penal Code. In the event the owner is unsuccessful in that proceeding, a final determination as to obscenity will be had in the criminal action which will ordinarily follow within a reasonable time, or other remedies such as mandamus will be available to secure return of the property.' (*Aday.* v. *Superior Court, supra,* 55 Cal.2d at p. 799 [13 Cal.Rptr. 415, 362 P.2d 47].)" (Italics added.) And at pages 88-89: "A determination of obscenity may therefore be made by a grand jury, *insofar as the issue of probable cause is concerned,* without the necessity of receiving evidence as to [contemporary community] standards." (Italics added.) If a grand jury may determine the issue of probable cause and an indictment subsequently issues, we see no reason why a magistrate may not issue a warrant upon the determination of probable cause. Certainly it is not contended that a grand jury proceeding is an "adversary proceeding."

We therefore are directly confronted with the question of the establishment of probable cause for issuance of the warrant. The warrant issued upon statements that: (1) the FBI informed Sergeant Shaidell that a reliable informant had informed them that defendant was selling obscene films and possibly Tijuana Bibles from his car and that the sales were taking place in various locations throughout the city; (2) Shaidell placed defendant's residence under surveillance and Shaidell observed defendant bring material (which was soon found to be films) from his house and place it in his Lincoln automobile; (3) defendant was followed to a service station, where a clandestine transaction involving four reels of film took place; (4) the purchaser of the films then attempted to hide them; (5) during the course of the transaction, defendant was overheard by

Officer Monnett[4] to say: "We'll have to jack these guys up to get 20 to 30 different films although these films are good. They show a lot of fuck action. Ray, I will see you later." A reasonable interpretation of these words is that the films there in the trunk showed obscene matter, so were "good"; that although this was so, defendant and his cohort should try to get some different, perhaps even more salacious, films from his source of supply.

The information supplied by the FBI cannot, obviously be considered as reliable since the "reliable" informant was not named, nor were the circumstances enumerated upon which his information was given. ■ But the police may use an untested informant's information to supply probable cause if through an independent investigation they find corroborating evidence. (*People* v. *Gallegos,* 62 Cal.2d 176, 179 [41 Cal.Rptr. 590, 397 P.2d 174]; *People* v. *West,* 3 Cal.App.3d 253, 256 [83 Cal.Rptr. 223].) "Such corroboration need not itself amount to reasonable cause to arrest; its only purpose is to provide the element of 'reliability' missing when the police have had no prior experience with the informant. Accordingly, it is enough if it gives the officers reasonable grounds to believe the informant is telling the truth, for in this type of case the issue is 'not whether the information obtained by the officers emanated from a reliable source, but whether the officers could reasonably rely upon that information under the circumstances.' [Citations.]" (*People* v. *Lara,* 67 Cal.2d 365, 374-375 [62 Cal.Rptr. 586, 432 P.2d 202]; see also, *People* v. *Davis,* 2 Cal.App.3d 230, 235-236 [82 Cal.Rptr. 561].)

We believe that probable cause existed for the issuance of the warrant. ■ Probable cause exists if a man of ordinary care and prudence would be led to conscientiously entertain an honest and strong suspicion that the accused is guilty, or that contraband was present. (*People* v. *Scott, supra,* 259 Cal.App.2d 268, 275.) The circumstances involved in the clandestine transaction, plus the conversation that was overheard, *which, by reasonable inference in the setting, amounts to an admission that the films were obscene,* plus the house as the source of the films, in combination with the FBI information, supply the requisite probable cause for issuance of the search warrant. These circumstances, combined with the admission, not only provided a strong suspicion that the films were obscene, but the ordinary prudent man would certainly entertain an honest and clear con-

---

[4]Defendant at no time argued that the magistrate could not properly consider the hearsay contained in Sergeant Shaidell's affidavit. We therefore express no opinion concerning its propriety. (*People* v. *Scott,* 259 Cal.App.2d 268, 278-279 [66 Cal.Rptr. 257]; cf. *People* v. *Madden,* 2 Cal.3d 1017, 1021 [88 Cal.Rptr. 171, 471 P.2d 971]; *Remers* v. *Superior Court,* 2 Cal.3d 659, 666-667 [87 Cal.Rptr. 202, 470 P.2d 11].)

clusion that the films were obscene. ■ Having been informed that defendant was selling obscene material, and having independently corroborated that information with the admission contained in the conversation which was overheard, and by presenting these facts to a magistrate to obtain a search warrant, we believe that the higher standard required by the First Amendment for a search has been met and that the warrant legally issued.

The judgment is affirmed.

Reppy, J., concurred.

**KAUS, P. J.**—The business of this court is too heavy to take the time and make a law review article of my dissenting view with respect to the validity of the search warrant that was used to ransack defendant's home and remove therefrom 91 reels of film and 162 "booklets." I will therefore content myself to outline my understanding of applicable law.

1. I have serious doubts that even if the subject matter of the seizure were ordinary contraband, rather than material which is prima facie protected by the First Amendment, there was probable cause to believe that anything would be found in defendant's home. As I interpret the facts all that the magistrate knew, through the affidavit, was that a person whom an unidentified reliable informant had pointed out to an unnamed employee of the F.B.I. as a seller of obscene matter from the back of his car, had left his home carrying a box which he put in the trunk of a car from which trunk four reels of film were later taken by another man, who then went to some pains to conceal them. In addition, of course, there was the snatch of conversation overheard by Officer Monnett.[1] This was followed by Ray giving defendant some money. We do not know whether this was in payment for the films Ray had just received or was given to enable defendant to purchase more films. Nor is it clear whether defendant's description of something—presumably films—referred to the ones he had handed Ray or to others he was about to buy. Certain is that the former were no longer in defendant's home, if they had ever been there, and that the observations by the two officers did not justify anyone in believing that after defendant left the gas station he had acquired additional films, which would be found in his home.

We have all handled enough narcotics cases and thus gained knowldege

---

[1] I assume that the magistrate was entitled to consider defendant's statement to Ray, although Monnett did not swear to it. *United States* v. *Ventresca*, 380 U.S. 102, at page 111 [13 L.Ed.2d 684, at page 690, 85 S.Ct. 741]. "Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number."

of the habits of peddlers, that we may perhaps reasonably suspect that such a person who deals a small amount of merchandise from his home, has more where it came from. I confess to no comparable knowledge when it comes to smut, nor does the record contain any expert evidence on the point.

2. More important, however, I think the court's opinion puts the cart before the horse when it concludes that no First Amendment problem is involved because this case involves the distribution and sale of obscene matter or alternatively, that all we have been told by the series of Supreme Court cases both federal and state, which have adverted to the problem of how to search for and seize alleged obscene matter, is that a "stronger" showing of probable cause before a magistrate is required when books and films are involved.[2] Surely what the Supreme Court cases teach us is that when the police and the courts deal with material presumably protected by the First Amendment, different procedures are called for.

I do not claim that it is or should be the law that a search warrant for books and films can only issue after an adversary hearing. I do, however, maintain that it should not be the law—and no case I have seen has ever so held—that such materials can be seized on the order of a magistrate who knows nothing whatever about them except that the person whose home he permits to be invaded has made a statement indicating some connection with motion pictures depicting sexual activity.[3]

There is, of course, an obvious difference between this case where the warrant authorized a mass seizure of material falling within its broad description, and the several California cases relied on by the People which directed the seizure of specific allegedly obscene matter (*Monica Theater*

[2]The fact that the magistrate in the instant case had a hair trigger pen when it came to signing search warrants, is amply proved by the fact that he permitted the search for, and seizure of tijuana bibles and, both with respect to such items and films, went along with Officer Shaidell's lurid description of what they would contain. I have a substantial reservation that the over-breadth of the warrant is saved by *Aday* v. *Superior Court*, 55 Cal.2d 789 [13 Cal.Rptr. 415, 362 P.2d 47]. There the court held that the invalid portions of the search warrant in question could be severed from the valid ones. It did, however, add: "In so holding we do not mean to suggest that invalid portions of a warrant will be treated as severable under all circumstances. We recognize the danger that warrants might be obtained which are essentially general in character but as to minor items meet the requirement of particularity, and that wholesale seizures might be made under them, in the expectation that the seizure would in any event be upheld as to the property specified. Such an abuse of the warrant procedure, of course, could not be tolerated." (*Aday* v. *Superior Court, supra*, 55 Cal.2d 789 at p. 797.)

[3]Not too many years ago such films were shown at clandestine stag parties. Today people complain with some justification that it is difficult to find a motion picture which does not, more or less explicitly, depict a sexual act.

v. *Municipal Court*, 9 Cal.App.3d 1 [88 Cal.Rptr. 71] [one copy of one film and specific photographs]; *People* v. *de Renzy*, 275 Cal.App.2d 380 [79 Cal.Rptr. 777] [two reels of a specific film])[4] in which it was held that a prior adversary hearing was unnecessary.

Whether or not these cases will eventually pass scrutiny by higher courts[5] does not concern me, for it is emphatically clear that they differ from the case at bar in two major respects: first, what the warrant here directed and what the police carried out was not the seizure of a single copy of a specifically designated item, but truly a mass seizure;[6] second, there was not even an ex parte hearing on the question whether the items to be seized were obscene.

One simply cannot approach this case as if the validity of the warrant presented but a Fourth Amendment problem. It may be conceded for the sake of argument that if defendant had been suspected of peddling dope instead of smut, reasonable cause to believe that he was in possession of contraband did exist. However, what relevant Supreme Court decisions have made clear is that the seizure of films and reading matter presents a First Amendment problem. (*Marcus* v. *Search Warrant*, 367 U.S. 717, 730-731 [6 L.Ed.2d 1127, 1135-1136, 81 S.Ct. 1708]; *Flack* v. *Municipal Court*, 66 Cal.2d 981, 989-990 [59 Cal.Rptr. 872, 429 P.2d 192].)

In considering this problem one must, of course, forget that the successful execution of the warrant did expose defendant as a peddler of hard core pornography. Defendant is not the first of his ilk whose "vindication" has preserved the First Amendment rights of others. As another division of this court said in a very similar case when it felt constitutionally bound to rule in favor of an alleged pornographer: "In reaching this conclusion it

---

[4]In *People* v. *Chapman*, 17 Cal.App.3d 865 [95 Cal.Rptr. 242], the warrant directed the seizure of 30 specifically identified magazines and paperbacks. Actually seized were 47 magazines and 31 paperbacks, some of which were, naturally, not named in the warrant. The municipal court ordered that only the material not listed on the warrant be returned to the defendant, although it apparently found it to be obscene. The appellate department suppressed the lot. On certification the Court of Appeal vacated the order of the municipal court with respect to the unlisted material and upheld the seizure of the listed magazines and books. As I read the case the vacation of the order with respect to the unlisted material was based on the finding that it was obscene and, hence, non-returnable contraband (*Aday* v. *Superior Court*, 55 Cal.2d 789, 800 [13 Cal.Rptr. 415, 362 P.2d 47]) and did not amount to a ruling that it would be admissible in evidence.

[5]A review of conflicting decisions concerning the necessity of a pre-seizure adversary hearing will be found in Hirsch and Ryan, *I Know It When I Seize It: Selected Problems in Obscenity*, 4 Loyola L.Rev. 9, 23-65.

[6]As noted, the search netted 91 reels of film and, according to the list of exhibits which is part of our record, 162 "booklets."

has been necessary for us to cling steadfastly to the basic truth stated in Judge William C. Mathes' aphorism 'that the rights of good men are secure only so long as the rights of bad men are also protected.' " (*Aday* v. *Municipal Court,* 210 Cal.App.2d 229, 249 [26 Cal.Rptr. 576].)

It would be tedious to retrace, once more, the history of Supreme Court decisions dealing with the validity of warrants directing the seizure of matter allegedly obscene. It is sufficient to refer to our Supreme Court's review in *Flack* v. *Municipal Court,* 66 Cal.2d 981 [59 Cal.Rptr. 872, 429 P.2d 192].

Admittedly no case has been found precisely on all fours with the one at bar, but I strongly suspect that the reason for this lack of authority is that no such sweeping attempt to empty a man's home—or, for that matter, his place of business—has ever been made on so little evidence that obscene materials would be found.

The problem is not whether an experienced vice officer could reach a reasonable conclusion that material such as was described in the affidavit would be precisely what the search would reveal. The question is, rather, whether on such evidence a magistrate could order the seizure of material which could be constitutionally protected, and which no one had even described to him. As the Supreme Court said in *Flack*: "Although *Marcus, Quantity of Books* and *Stanford* [v. *Texas,* 379 U.S. 476 (13 L.Ed.2d 431, 85 S.Ct. 506)] all dealt with search warrants issued under civil rather than criminal proceedings, [footnote omitted] their common thread seems clear: since obscenity is often separated from constitutionally protected expression by only a 'dim and uncertain line' (*Bantam Books, Inc.* v. *Sullivan* (1963) 372 U.S. 58, 66 [9 L.Ed.2d 584, 590, 83 S.Ct. 631]), purported obscenity maintains, until such time as it is judicially determined to be unprotected speech, the same 'preferred position' as does free speech generally (*Murdock* v. *Pennsylvania* (1943) 319 U.S. 105, 115 [87 L.Ed. 1292, 1300, 63 S.Ct. 870, 146 A.L.R. 81]), and the ordinary rules of search and seizure are inapplicable to it. Thus, allegedly obscene material cannot be treated in the same manner as contraband such as narcotics and burglar tools for purposes of search and seizure. (*Marcus* v. *Search Warrant* (1961) *supra,* 367 U.S. 717, 730-731 [6 L.Ed.2d 1127, 1135-1136, 81 S.Ct. 1708].)" (*Flack* v. *Municipal Court, supra,* 66 Cal.2d at pp. 989-990.)

Compare the present case with *A Quantity of Books* v. *Kansas,* 378 U.S. 205 [12 L.Ed.2d 809, 84 S.Ct. 1723]. There the information, the legal equivalent of an affidavit in support of a search warrant, identified 59 novels, each of which was published as a "Nightstand" book. Seven of the

novels were submitted with the information. A judicial officer held an ex parte hearing in which he examined the seven books. He came to the reasonable conclusion that all "Nightstand" books would be similar and ordered the seizure of all 59 titles, 31 of which were actually found; 1,715 copies were seized. The warrant included a notice of a hearing to be held 10 days later, as required by the applicable Kansas statute.

The procedure was held to be unconstitutional as an invalid prior restraint on the distribution of matter which presumptively was protected by the First Amendment. The court made no distinction between the seven titles which had been subjected to judicial scrutiny before the issuance of the warrant, and the others. It did not even consider the question whether the books were, in fact, obscene. (See also *Marcus* v. *Search Warrant,* 367 U.S. 717, 738 [6 L.Ed.2d 1127, 1139, 81 S.Ct. 1708].)

What differences there are between *Quantity* and this case, all favor the former: there there was at least an ex parte scrutiny of seven titles and the Kansas statute entitled the person from whom the matter was seized to a hearing in a shorter time than any statute of this state guarantees.

In *Lee Art Theatre, Inc.* v. *Virginia,* 392 U.S. 636 [20 L.Ed.2d 1313, 88 S.Ct. 2103], a police officer had actually seen the motion picture involved. His affidavit recited that he had determined it to be obscene on the basis of his viewing of it and of the billboard in front of the theatre. A warrant was issued and the film seized. Without deciding that it would have been necessary for the magistrate to see the picture before issuing the warrant, the court held that it should not have issued on the conclusionary allegation in the affidavit.

Even *Lee Art Theatre* had more to back up the warrant than does this case. At least the police officer had seen the particular picture involved. Here nobody had seen anything.

On the basis of the authorities, I would feel compelled to reverse if I could find another judge to agree with me.

Appellant's petition for a hearing by the Supreme Court was denied November 24, 1971. Peters, J., was of the opinion that the petition should be granted.