[Crim. No. 23126. Second Dist., Div. Two. May 22, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
DORIAN BURNSTAD, Defendant and Appellant.

COUNSEL

Boss & Mason and Lawrence E. Mason for Defendant and Appellant.

Roger Arnebergh, City Attorney, and Marshall Rubin, Deputy City Attorney, for Plaintiff and Respondent.

OPINION

COMPTON, J.—The defendant is charged in a misdemeanor complaint filed by the City Attorney of the City of Los Angeles with five counts of violating section 311.2 of the Penal Code (possession with intent to distribute and distributing obscene matter).

On May 31, 1972, defendant moved in the Municipal Court of the Los Angeles Judicial District under Penal Code section 1538.5 for the suppression and return of a quantity of motion picture films which had been seized by officers of the Los Angeles Police Department. That motion was denied and defendant appealed to the appellate department of the superior court. That court affirmed the refusal to suppress certain of the films but ruled that others should be suppressed as evidence and returned to defendant. We accepted certification and have concluded that the appellate department was in error. We affirm the order of the municipal court.

At the hearing conducted in the municipal court a search warrant specifically describing five of the seized films and the affidavit in support thereof was received in evidence. Officer Wilbur Dixon of the Los Angeles Police Department who had executed the affidavit and served the warrant testified at the hearing. Defendant was there seeking to quash the search warrant and suppress the films seized thereunder and also to suppress additional films seized by the officer at the time he executed the warrant. On this appeal defendant has abandoned his attack on the search warrant and seeks return of the films not therein described.

From the affidavit and testimony at the hearing we glean the following factual background.

On January 3, 1972, Officer Dixon was told by an informant that one Dorian Burnstad (defendant) had offered to sell "hardcore" 16 mm. colored films to the informant. Burnstad had given a business card to the informant which the informant in turn gave to Officer Dixon. The card

described Burnstad as a film broker dealing in 16 mm. films and contained a telephone number. A check of the telephone company records showed that the telephone was registered to a person named Porter who was known to the officers as having been arrested for violating Penal Code section 311.2.

Officer Dixon phoned the number and talked to defendant who agreed to meet the officer at a restaurant on the following day to discuss a sale of films. Needless to say, the officer did not disclose his official position to defendant.

The meeting as arranged occurred on January 4, 1972, at which time defendant told the officer that "he had to be very careful because he could be arrested for selling the type of films he has for sale." Defendant further stated that "the films are hardcore, with acts of oral copulation and sexual intercourse and none of the sex scenes would be simulated." Defendant stated that he had two types—"features" and "loops." A "feature" contains all the sex acts, with a short story. A "loop" is a series of 12 minute segments depicting the same sex acts but with no story.

Defendant went on to describe the running time and the price of the films. The meeting terminated with no sale being consummated. Apparently the officer indicated to defendant that he could be contacted at a designated room in the Holiday Inn Hotel in Hollywood.

Surveillance of defendant established that he lived at a location in Burbank and that he kept films there as well as at a location in Sun Valley, California. This surveillance also indicated an association between defendant and the previously mentioned Porter.

On January 26, 1972, defendant telephoned Officer Dixon at the Holiday Inn and offered to bring four films to the officer's room for viewing. He arrived with five films which the officer viewed. According to the officer these films all consisted of nothing but a series of various sex acts including oral copulation.

During the viewing of the film defendant stated "After you see the first 15 minutes of any of these films the end of the films are approximately the same." One of the films was a "feature" entitled "The Man From Snatch." The others were "loops." Defendant stated that he also had some high quality "hardcore" sound films which he rented for $500 a week, and "hardcore" cartoons which sold for $60 per reel. A meeting for consummation of a sale of the films was set for February 10, 1972.

On February 9, 1972, Officer Dixon obtained a search warrant directed

to defendant's residence in Burbank and the previously described location in Sun Valley. The warrant ordered seizure of the five films which defendant had shown to Officer Dixon at the Holiday Inn. They were described as follows: "One print each of five 16mm color motion picture films depicting acts of oral copulation, sexual intercourse, and sex perversion, bearing the following title, and markings on the film cans: 'The Man From Snatch, L-8A,' L-35 Silent Loops, 230 Silent Loops, L-19 Silent Loops, L-18 Silent Loops, . . . ."

On February 10, 1972, before executing the search warrant, Officer Dixon contacted defendant in the parking lot of a restaurant in North Hollywood. Defendant then handed Officer Dixon a paper bag containing films which he represented to be the films the officer had previously viewed. Defendant quoted a price but instead of paying defendant for the films the officer displayed his badge and advised defendant that he was armed with a search warrant for the indicated locations.

Apparently the films in the bag were different from those previously seen by Officer Dixon. The films named in the warrant were seized at one of the locations named in the warrant. In addition, the officer seized a number of other films which he viewed together with those contained in the bag. All seized films were of context similar or exactly like the films named in the warrant.

At this point in the proceedings there has been no adversary hearing on the issue of the obscene character of any of the films. The original prosecution is still pending. Defendant has sought no hearing on the issue pursuant to Penal Code section 1538.5, subdivision (n), Penal Code section 1539 or Penal Code section 1540. In fact, defendant has made no contention that the films are not obscene. He contends simply that the films not named in the warrant must be returned regardless of whether they are obscene. He relies on *Marcus* v. *Search Warrant,* 367 U.S. 717 [6 L.Ed.2d 1127, 81 S.Ct. 1708], *A Quantity of Books* v. *Kansas,* 378 U.S. 205 [12 L.Ed.2d 809, 84 S.Ct. 1723], and *Flack* v. *Municipal Court,* 66 Cal.2d 981 [59 Cal.Rptr. 872, 429 P.2d 192].

Insofar as is relevant to this case those decisions declare that while obscene material is contraband and not protected by the First Amendment of the United States Constitution, it is not easily recognizable as such in the same manner as narcotics, gambling paraphernalia or other types of contraband. Thus the rules generally applicable to the seizure of contraband or its return do not apply.

Those general rules are that officers in effecting a valid arrest may seize

contraband discovered in a properly conducted contemporaneous search. Officers in properly executing a search warrant may seize contraband even though such contraband is not mentioned in the warrant. Even though contraband which is seized as the result of an unreasonable search may not be used as evidence, no person may obtain its return.

When matters which presumptively enjoy First Amendment protection are sought to be seized or retained, the law requires initially a judicial determination as to their probable obscene character and a prompt final adjudication in an adversary setting of their actual obscene character which adjudication may result in return of the material.

In *People* v. *Chapman,* 17 Cal.App.3d 865 [95 Cal.Rptr. 242] (hg. den. Aug. 13, 1971) on facts quite comparable to the case at bar, the court held that a search warrant issued ex parte upon a showing of probable cause was valid for seizing allegedly obscene books and that books not named in the warrant which had been seized contemporaneously with the execution of the warrant could be retained by the court pending a judicial determination of their non-obscene character. (See also *Aday* v. *Superior Court,* 55 Cal.2d 789 [13 Cal.Rptr. 415, 362 P.2d 47]; *People* v. *Luros,* 4 Cal.3d 84 [92 Cal.Rptr. 833, 480 P.2d 633], and *People* v. *Aday,* 226 Cal.App.2d 520 [38 Cal.Rptr. 199].)

*Chapman* appears to be a complete answer to defendant's contention here. However, our decision is buttressed by an element not shown to be present in either *Marcus, Kansas, Flack* or *Chapman.*

Officer Dixon was not here roaming at large attempting to use his own judgment as to what was or was not obscene, the type of conduct condemned in *Marcus, Kansas* and *Flack.* Here the defendant had himself placed the mark of contraband on the films. In all his dealings with Officer Dixon, defendant had pandered all of his films as "hardcore" pornography.

In the first place the films contained in the paper bag which defendant delivered to Officer Dixon were not "seized" by the officer in the sense that the term is used in applying the rules relating to suppression of evidence. Defendant was purporting to sell those films to the officer and voluntarily handed them over. Since the defendant represented them to be contraband, the officer's failure to pay for them did not give defendant a right to demand their return. Further, the officer's seizure of the contraband films at the other location was reasonable.

The one element of the definition of obscenity which is critical in setting apart material that otherwise might be considered as such is the presence of some redeeming social value. It is the difficulty in making this

determination that underlies the rationale of *Marcus, Kansas* and *Flack*. But here, as in *Ginzburg* v. *United States,* 383 U.S. 463, at pp. 474-475 [16 L.Ed.2d 31, at p. 40, 86 S.Ct. 942], ". . . the fact that each of [the films] was created or exploited entirely on the basis of·its appeal to prurient interests strengthens the conclusion [the films] . . . were . . . illicit merchandise, not . . . constitutionally protected matter."

Further, in *Ginzburg,* at p. 470 [16 L.Ed.2d at p. 38], "Where the purveyor's sole emphasis is on the sexually provocative aspects of his publications, that fact may be decisive in the determination of obscenity." And "a court [and we think a policeman in making an initial seizure] could accept his [the purveyor's] evaluation at its face value." (*Memoirs* v. *Massachusetts,* 383 U.S. 413, at p. 420 [16 L.Ed.2d 1, at p. 7, 86 S.Ct. 975]; also see *Mishkin* v. *New York,* 383 U.S. 502 [16 L.Ed.2d 56, 86 S.Ct. 958].)

In *Aday, supra,* at p. 798, we find the following language: "Since there was probable cause to believe that the named books were used or were intended to be used as a means of committing the alleged offense, *all* copies on the premises could be seized . . . ." (Italics added.)

Further, in *Aday,* at p. 799: "The seizure of all copies of an allegedly obscene book is not invalid if made on probable cause . . . ."

■ Here, by defendant's own statements and the officer's description, the films seized are really *all* copies of the same thing, i.e., hour long films of the same repetitive sex acts. The fact that defendant chose to give them different titles and numbers would not detract from the reasonableness of the officer in.believing them to be copies of the film described in the warrant and that they were intended to be used as a means of committing the offense.

The order of the municipal court refusing to suppress and return the films is affirmed.

Roth, P. J., and Fleming, J., concurred.

Appellant's petition for· a hearing by the Supreme Court was denied July 18, 1973.