[L.A. No. 30363. In Bank. Apr. 22, 1975.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
HAROLD FREEMAN et al., Real Parties in Interest.

### Counsel

Joseph P. Busch, District Attorney, Harry B. Sondheim and Sterling S. Suga, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

Fleishman, McDaniel, Brown & Weston, David M. Brown and John H. Weston for Real Parties in Interest.

### Opinion

**MOSK, J.**—Defendants, real parties in interest herein, were charged with conspiracy to violate Penal Code section 311.2.[1] Their motion to suppress the evidence on the ground of illegal search and seizure was granted, and the People seek review by statutory writ of mandate. (Pen. Code, § 1538.5, subd. (o).)

In *Flack* v. *Municipal Court* (1967) 66 Cal.2d 981 [59 Cal.Rptr. 872, 429 P.2d 192], we considered whether seizure of motion picture film alleged to be obscene without a search warrant or prior judicial determination of obscenity violates the First Amendment to the United States Constitution.[2] Relying on *Marcus* v. *Search Warrant* (1961) 367 U.S. 717 [6 L.Ed.2d 1127, 81 S.Ct. 1708], and *A Quantity of Books* v. *Kansas* (1964) 378 U.S. 205 [12 L.Ed.2d 809, 84 S.Ct. 1723],[3] we

---

[1]This section provides, inter alia: "(a) Every person who knowingly sends or causes to be sent, or brings or causes to be brought, into this state for sale or distribution, or in this state possesses, prepares, publishes, or prints, with intent to distribute or to exhibit to others, or who offers to distribute, distributes, or exhibits to others, any obscene matter is guilty of a misdemeanor. . . ."

[2]References to the "First Amendment" or "First Amendment material" are used throughout this opinion as an abbreviated designation of material protected under the federal Constitution and under article I, sections 1 and 2, of the California Constitution. (See *White* v. *Davis* (1975) 13 Cal.3d 757, 767, fn. 3 [120 Cal.Rptr. 94, 533 P.2d 222].)

[3]In *Marcus* a warrant was issued in an ex parte proceeding authorizing officers to search the defendants' premises and seize all "obscene" materials. None of the allegedly obscene materials was shown to the magistrate. Some 11,000 copies of 280 publications were seized, only one-third of which were actually found to be obscene. The Supreme Court ruled that the state procedure vested undue discretion in the officer and failed "to focus searchingly on the question of obscenity." (367 U.S. at p. 732 [6 L.Ed.2d at p. 1136].)

In *Quantity of Books* a four-judge plurality invalidated a Kansas warrant procedure for failure to afford the defendants a pre-seizure adversary hearing on the question of obscenity. This requirement was limited to cases involving "the seizure of large

concluded "Within the precinct of the First Amendment, only the requirement that a search warrant be obtained prior to any search and seizure assures a free society that the sensitive determination of obscenity will be made judicially and not *ad hoc* by police officers in the field." (Fn. omitted.) (*Flack,* at p. 992 of 66 Cal.2d.) We determined that "with the exception of a situation involving a legitimate emergency, even if the search is contemporaneous with an arrest, a search warrant must be secured prior to any search for or seizure of material alleged to be obscene " (Fns. omitted.) (*Id.* at p. 991.)

The United States Supreme Court has recently reiterated these same principles. In *Roaden* v. *Kentucky* (1973) 413 U.S. 496 [37 L.Ed.2d 757, 93 S.Ct. 2796], a county sheriff viewed a sexually explicit film at a local drive-in theatre, determined it to be obscene, and in the course of arresting the defendant seized a copy of the film as evidence. The court proceeded from the premise that "A seizure reasonable as to one type of material in one setting may be unreasonable in a different setting or with respect to another kind of material. [Citation.]" (*Id.* at p. 501 [37 L.Ed.2d at p. 763].) Thus "The seizure of instruments of a crime, such as a pistol or a knife, or 'contraband or stolen goods or objects dangerous in themselves,' . . . are to be distinguished from quantities of books and movie films when a court appraises the reasonableness of the seizure under Fourth or Fourteenth Amendment standards." (*Id.* at p. 502 [37 L.Ed.2d at p. 763].) In applying the special rules governing seizure of allegedly obscene materials the majority reaffirmed the holdings in *Marcus, Quantity of Books,* and *Lee Art Theatre* v. *Virginia* (1968) 392 U.S. 636 [20 L.Ed.2d 1313, 88 S.Ct. 2103],[4] and concluded: "If, as *Marcus* and *Lee Art Theatre* held, a warrant for seizing allegedly obscene material may not issue on the mere conclusory allegations of an officer, *a fortiori,* the officer may not make such a seizure with no warrant at all." (*Id.* at p. 506 [37 L.Ed.2d at p. 766].)

The case at bar is controlled by the dictates of *Flack* and *Roaden.* Defendants herein were engaged in a continuing enterprise involving the preparation and distribution of sexually explicit material. They were contacted at their permanent business office, the "Hollywood House of

quantities of books for the sole purpose of their destruction" in *Heller* v. *New York* (1973) 413 U.S. 483, 491 [37 L.Ed.2d 745, 753, 93 S.Ct. 2789].

[4]In a per curiam opinion the Supreme Court in *Lee Art Theatre* invalidated a warrant issued on the basis of the officer's affidavit stating only the titles of the films and that the officer had determined from personal observation of them and of the billboard in front of the theatre that the films were obscene. The procedure was deficient in that there was no factual inquiry by a magistrate into the officer's conclusions.

Films," by Deputy Sheriff Young, who posed as a buyer seeking to acquire pornographic materials for his business in Hawaii. After the initial contact an appointment was arranged between defendant Freeman and Young. At this meeting Freeman stated to the officer, "I have some good action films, sucking and fucking," and further informed him that the price of these creations was between $550 and $2,000 for one-hour, feature-length color sound films.

While Freeman and the officer were discussing film, defendant Horne collected various samples for the buyer's perusal. Freeman handed the officer an album of still photographs, apparently containing memorable moments from some of the more explicit productions. Horne arrived back at the office with a cart containing boxes of film, one of which was placed on a reel-to-reel viewer. At this point Horne told Freeman that he thought "there was some cops downstairs—or hanging around downstairs." Freeman then told him "to take the stuff back" and Horne left the office with the films and the hand cart.

After Horne's withdrawal the film on the viewer was played for Deputy Young. The film was run at three times normal speed and without sound, but these limitations did not appear to detract from the officer's ability to ascertain its central theme. After viewing the film the deputy concluded it was obscene, arrested Freeman, and seized the film and the album of still photographs. At a prearranged signal five or six other deputies entered the office and conducted a thorough search of the premises. Apparently the theory of each officer was, in paraphrase of Justice Stewart's pithy expression, "I know it when I seize it." (See 4 Loyola L.Rev. (1971) 9, 52-65.)

While these events were transpiring Horne was taking the remainder of the film to an automobile parked outside the building. He placed the boxes in the trunk and back seat of the car, then "drove around in circles" for 10 to 15 minutes. At all times he was under surveillance by officers stationed outside Freeman's office. Horne then returned to the office and was himself arrested. The officers conducted a complete search of the car and seized the aforementioned film canisters from the trunk and back seat.

The evidence sought to be suppressed includes the film viewed by Deputy Young, the film seized from the car, and the album of still photographs. At no time was a warrant obtained for the seizure of any of these items.

The People first seek to avoid the strict warrant requirement of *Flack* and *Roaden* with the contention that "No search warrant was required because of the defendant's admission that the material being pandered was obscene." In view of Freeman's representations to Deputy Young, it is urged "that whatever impartial judicial determination on the question of obscenity to which the defendant was entitled had been voluntarily waived by reason of his own conduct." The support for this novel proposition is said to be the cases of *People* v. *Burnstad* (1973) 32 Cal.App.3d 560 [108 Cal.Rptr. 247], and *People* v. *Golden* (1971) 20 Cal.App.3d 211 [97 Cal.Rptr. 476].

*Golden* is clearly inapposite. There the issue was not the warrantless seizure of suspected obscene material but rather the legal sufficiency of the affidavit pursuant to which a warrant was issued by the intervening magistrate. The purported admission of the defendant during a clandestine transaction, coupled with other evidence of possession of obscene material with the intent to distribute, were held by a divided court to be sufficient to support the issuance of the warrant.

In *Burnstad* a warrant had also been obtained. There an undercover officer had viewed certain of the defendant's films and arranged a meeting in order to purchase them. Prior to the meeting a warrant was issued authorizing the search of two locations and the seizure of the films the officer had viewed. However, in executing the warrant the officer seized a number of films not named in the warrant. In upholding the validity of this latter seizure the court distinguished *Flack* on the ground that "Here the defendant had himself placed the mark of contraband on the films. In all his dealings with Officer Dixon, defendant had pandered all of his films as 'hardcore' pornography." (32 Cal.App.3d at p. 565.)

While a warrant was obtained in that case, to the extent that *Burnstad* can be said to stand for the proposition that the warrant requirement of *Flack* and *Roaden* is rendered unnecessary by a defendant's own pejorative characterization of the material it is hereby disapproved. Theatre marquees, billboards and newspaper advertisements all too often appeal to base instincts by making extravagant claims concerning the licentiousness depicted on movie screens, yet no serious claim could be made that mere suggestive or disparaging descriptions justify a warrantless seizure of the films.[5] Whatever reaction might be

---

[5]The facts of *Lee Art Theatre* may fairly be analogized to the instant case on this point. There the officer relied on the "representations" of the theatre billboard as well as his own observations to obtain a warrant, but the procedure was still held inadequate. Here, not only was no warrant obtained, but the officers never even saw the vast majority of film seized and here sought to be suppressed.

evoked by defendant's inelegant assessment of content in the instant case, it is nonetheless clear that presumptively protected First Amendment material cannot be transmuted into contraband merely by the crude puffing of a seller who emphasizes its purported salacious features.

Nor does *Ginzburg* v. *United States* (1966) 383 U.S. 463 [16 L.Ed.2d 31, 86 S.Ct. 942], relied upon in *Burnstad,* compel a different conclusion. In *Ginzburg* the defendant went to extraordinary lengths to sell his publications on the basis of their prurient appeal, such as obtaining mailing permits from communities with sexually suggestive names and stressing in advertising circulars the erotic nature of the material. The Supreme Court held that in a close case evidence of commercial exploitation of erotica solely on the basis of its sensual appeal may be determinative: "Where the purveyor's sole emphasis is on the sexually provocative aspects of his publications, that fact may be decisive in the determination of obscenity. . . . [¶] . . . [B]y animating sensual detail to give the publication a salacious cast, petitioners reinforced what is conceded by the Government to be an otherwise debatable conclusion." (*Id.* at pp. 470-471 [16 L.Ed.2d at p. 38].)

That a defendant's characterization of his material in the course of an attempted sale may be considered ultimately by the trier of fact at an obscenity trial in no way compels a conclusion that an investigating police officer may regard these purported admissions as authority to dispense with the necessity to obtain a warrant. The issue of obscenity is a complex legal question, to be decided by judges and magistrates. Motion pictures, even those suspected of being obscene, are presumptively protected by the First Amendment and may not be seized by police officers without a judicial determination that there is probable cause to believe the subject material falls outside the purview of that amendment.[6]

There is one narrow exception to this strict warrant requirement, the so-called "emergency exception." In *Flack* we stated, "We conceive of a legitimate emergency arising in arrest situations involving a high probability that evidence may be lost, destroyed, or spirited away. The one-night surreptitious screening of a film at a locked-door 'stag' party may under appropriate circumstances justify seizure without a warrant."

---

[6]The additional contention that Freeman in some way "consented" to the search or waived his Fourth Amendment rights is spurious. No evidence was introduced to support this theory, nor was the case tried on that basis. Voluntary consent is a question of fact to be determined from the circumstances of the case (see *Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218, 248-249 [36 L.Ed.2d 854, 875-876, 93 S.Ct. 2041]), and in the present record there appear no facts indicating any knowing relinquishment of constitutional rights.

(66 Cal.2d at p. 991, fn. 10.)[7] In *Roaden* the court noted, "Where there are exigent circumstances in which police action literally must be 'now or never' to preserve the evidence of the crime, it is reasonable to permit action without prior judicial evaluation." (Fn. omitted.) (413 U.S. at p. 505 [37 L.Ed.2d at p. 765].) On the basis of this exception the People contend that even if a search warrant was required in the instant case the existence of "a legitimate emergency" excused its issuance.

The exception under consideration is extremely limited, and the People must sustain a considerable burden in demonstrating its applicability. ■ Even in the ordinary case of a warrantless search this burden exists (*Badillo* v. *Superior Court* (1956) 46 Cal.2d 269, 272 [294 P.2d 23]), but the First Amendment demands the most restrictive rules where the search relates to presumptively protected material. (*Flack,* at p. 991 of 66 Cal.2d.) Thus in order for the exception to be operative the People must show there was probable cause to believe the material was obscene and their opportunity for seizure was limited to "now or never."

In the instant case neither burden is met. The canisters of film seized from the car were never seen by any of the officers, and aside from Freeman's representations they had no inkling as to their contents. Serious doubts may be entertained as to whether this evidence would even be sufficient to support the issuance of a warrant. (See *Lee Art Theatre* v. *Virginia* (1968) *supra,* 392 U.S. 636, 637 [20 L.Ed.2d 1313, 1315].) In addition, Freeman's operation was not the one-night surreptitious screening envisaged in *Flack* but rather a continuing enterprise replete with office, secretary, reception room, and all the trappings of a permanent business arrangement. There appears no reason why Deputy Young could not have viewed the films, presented a sufficiently detailed affidavit to a magistrate, and returned to Freeman's office armed with a warrant for their seizure.[8]

The People next seek to justify the warrantless seizure of the films from Horne's automobile on the rationale of *People* v. *Dumas* (1973) 9 Cal.3d 871 [109 Cal.Rptr. 304, 512 P.2d 1208]. The argument illustrates a misconception which pervades this entire area: the equation of presump-

---

[7] It may be that the locked-door stag party for film viewing has become an anachronism. (See *People* v. *Golden, supra,* 20 Cal.App.3d at p. 219, fn. 3, Kaus, P. J., dissenting.)

[8] Although Freeman indicated to Deputy Young that he kept most of his film at another, unnamed location, the film would have had to have been brought to the officer if the purported sale was to be completed. Additionally, the officer could not legally have seized this unseen film even had he known its location, since there would be no probable cause to believe that it was not within the protection of the First Amendment.

tively protected First Amendment material with ordinary contraband. In *Dumas,* the police had obtained a warrant to search the defendant's apartment and certain other areas under his control for stolen railroad bonds, bank checks and narcotics. The search of the apartment proved fruitless but the officers did find defendant's automobile registration and car keys. The automobile, parked in the street some 100 feet away from the apartment building, was then searched and stolen securities, a loaded revolver and some narcotics were found in the trunk. We recognized that "The warrant obtained by the police officers in this case does not support their search of defendant's automobile" (*id.* at p. 880), but nevertheless upheld the search on the ground there was "probable cause to search defendant's automobile under unforeseeable circumstances in which the securing of a warrant was impracticable." (*Id.* at p. 885.)

It is thus clear that two independent factors must coexist for the *Dumas* rationale to become operative: probable cause and exigent circumstances. Neither is present here. As discussed *ante,* the substantiality of Freeman's business operation rebuts the contention that seizure of the film was a "now or never" operation. It is also apparent there was no probable cause to believe the film was obscene. If Horne's hand cart had contained narcotics or weapons, the officers arguably would have been justified in searching the automobile to recover this contraband. Instead the items seized were canisters of film, never viewed by any of the officers and still shrouded in the protective cloak of the First Amendment. As made abundantly clear in *Flack* and *Roaden,* this type of material can never be considered contraband absent a judicial determination that there is probable cause to believe the material falls outside the constitutional protection. ▆▆ ▆▆▆▆ Accordingly, the seizure of the film in the automobile cannot be justified on any of the traditional Fourth Amendment exceptions relating to warrantless seizures of contraband, such as the "plain view" theory, the *Dumas* rationale, or the doctrine allowing limited search and seizure incident to arrest.[9]

---

[9]The dissent argues that under the facts there were the requisite exigent circumstances. As to the *seen* film this argument is clearly unsound because this film never left Freeman's office. As to the *unseen* film, even assuming that in taking the film to Horne's car an exigent circumstance was created, it is apparent there was no probable cause to believe this particular film was not protected First Amendment material. Freeman's characterization of his inventory plus the "illustrative" film viewed by Deputy Young could no more lead to the conclusion that all the remainder of the film was obscene than could a random sampling of a single book of a bookseller characterizing his inventory as sexually explicit lead to the conclusion that all the unseen books in his store were obscene. (See fn. 3, *ante.*) Indeed as *Marcus* and *Lee Art Theatre* demonstrate, these latter facts, if presented to a magistrate, would not even suffice to obtain a warrant. Our conclusion can thus be stated quite simply: as to the material for which there were even arguable exigent circumstances (the unseen film), there was clearly no probable cause; as to the material for which there was arguable probable cause (the seen film), there were

The correct rule was stated in *Fixler* v. *Superior Court* (1974) 38 Cal.App.3d 475 [113 Cal.Rptr. 285]. There the question was whether a warrant for the seizure of two specifically named magazines authorized seizure of apparently similar magazines not named in the warrant. The court stated, "The trial court held that the total seizure was lawful in reliance on cases (such as *Skelton* v. *Superior Court* (1969) 1 Cal.3d 144 . . .) which allow the seizure of 'contraband' legitimately seen by officers while conducting a lawful search for other items. But we know of no authority that extends that rule to the seizure of matter which lies within the special protection of rules developed under the First Amendment. In fact, the cases which we have found hold that, where an item is sought which may turn out to be protected by the First Amendment, no seizure may be made without the express authority of a magistrate." (Fn. omitted.) (38 Cal.App.3d at p. 481.)[10]

As the seizure in this case was unlawful the trial court was correct in suppressing the evidence. The alternative writ of mandamus is discharged and the peremptory writ is denied.

Wright, C. J., Tobriner, J., and Sullivan, J., concurred.

**RICHARDSON, J.**—I respectfully dissent. In the majority view the case before us is "controlled" by two decisions, *Roaden* v. *Kentucky,* 413 U.S. 496 [37 L.Ed.2d 757, 93 S.Ct. 2796] and *Flack* v. *Municipal Court,* 66 Cal.2d 981 [59 Cal.Rptr. 872, 429 P.2d 192]. Both of these cases expressly, although in somewhat different phrasing, confirm that police officers may seize, without a warrant, movie films which they reasonably suspect are obscene if "exigent circumstances" exist which indicate that the films may be "lost, destroyed, or spirited away." (66 Cal.2d at p. 991, fn. 10; see, 413 U.S. at p. 505 [37 L.Ed.2d at p. 765].) The record discloses that the officers in question had reasonable cause to believe that the films ultimately seized were obscene, and that exigent circumstances justified the seizure.

clearly no exigent circumstances. Moreover, in view of the permanence of Freeman's business operation and the fact that the unseen film would have to have been brought back at the time of sale to the undercover officer, whom Freeman continued to regard as a bona fide buyer, we are convinced there were no exigent circumstances even as to the film taken to Horne's car. (See fn. 8, *ante.*)

[10]The high degree of suspicion with which we view purported exceptions to the warrant requirement is illustrated by the fact that neither this court nor the United States Supreme Court has ever sustained a warrantless seizure of presumptively protected First Amendment materials.

At the preliminary examination Deputy Sheriff Young testified regarding his initial telephonic contact with defendant Freeman and his visit by prearrangement with defendants at their office, "Hollywood House of Films." After Young's arrival and in his presence defendants Freeman and Horne engaged in a brief conversation after which Horne left. When Young announced that the purpose of his visit was to acquire some "hard-core" pornographic movie films, Freeman advised Young that he had some "good action" films. The majority describes Freeman's further graphic characterization of the films. Freeman then handed to Young, and asked him to examine, an album containing still color photographs of a variety of sexual activities. The album contained pieces of paper including one designated "Rental Films." While Young was examining the album, Horne returned to the office with a cart containing boxes of film, one of which was installed in a reel-to-reel viewer for Young's benefit. Before the film was viewed, Horne told Freeman "that he thought there was some cops downstairs—or hanging around downstairs." Freeman then inquired if Horne was sure, and when Horne nodded affirmatively, Freeman told Horne to "take the stuff back" at which time Horne left "carrying some of the films together with the handcart." The film which Young then viewed depicted various forms of very explicit sexual activity. During the office visit, Freeman, in Horne's absence, told Young that "he kept the films at another place; should the police come with a search warrant, they wouldn't find anything there."

While Freeman and Young were in defendant's office defendant Horne came under the surveillance of Deputy Sheriff McFee outside the building and was observed to move assorted film boxes from a 1969 Cadillac placing them in a handtruck and returning to the building which housed defendant's office. Five or ten minutes later Horne exited the same building with the same handcart and with "most of the film in boxes that were on there when he took them out of the Cadillac." Horne was seen to push the cart to a parked 1962 Chrysler, open the trunk put some of the "silver cans" in the trunk and the boxes into the back seat. Then, according to McFee, "[h]e jumped in the car and left hurriedly." Horne then for ten to fifteen minutes drove the Chrysler, making "several circles around several blocks," and returning to park approximately one-half block from where the car had been parked originally. Horne then returned to the office followed by McFee.

McFee was then told by Young that when Young first arrived at the office Horne came in with some items and that while he was there the other defendant told him to "get this stuff out of here." Young also told McFee that he had placed both Freeman and Horne under arrest. McFee then searched the Chrysler automobile with the use of keys given

to him by Horne and found approximately eight cardboard boxes in the rear seat. In the trunk McFee found three or four silver 16 mm. film cannisters and the handtruck. Before the seizure of the film, none of the officers had seen the film. However, it was stipulated for purposes of the hearing that the 50 reels of 8 mm. film which were introduced into evidence although of different subjects and taken at different times and places, were "similar in content and subject matter" to the 16 mm. film exhibited to Young and to the magistrate.

From the foregoing rather extended factual recitation appearing in the record, I reach the following conclusions. First, Officer Young reasonably believed the films in question, containing as they did graphic illicit sexual activities, were obscene, both those which he viewed and those which were unviewed. Freeman's own characterization of them was clear and explicit. The sample album (Exhibit 1) furnished Young by Freeman, presumably as illustrative of defendant's inventory, confirms their general nature. The single film (Exhibit 2) which Young viewed amply reinforced his impressions. In the record the film's character both at the time of the meeting in defendant's office and subsequently, was established clearly and unmistakably.

Second, exigent circumstances existed which amply justified the officers in seizing the film in order to prevent its concealment or destruction. During his preliminary discussions with Young, Freeman told him that "he kept the films at another place; should the police come with a search warrant, they wouldn't find anything there." Shortly thereafter, when Horne alerted Freeman to the suspicion that he "thought there was some cops downstairs—or hanging around downstairs," Freeman immediately instructed Horne to "take the stuff back." Horne then forthwith took the handcart containing all but one of the films selected for Young and left the room. He was then observed by McFee returning the film and placing them in a trunk of an automobile which he immediately drove away in a manner described by McFee as "hurried." Horne's route in the car was a random and erratic one and it extended over several blocks. Upon his return he parked the car in a different area. Given Freeman's original declaration as to his arrangements to store the film elsewhere so that searching officers armed with a warrant would be frustrated, Freeman's direction to Horne to remove the material immediately when alerted that officers were near, and Horne's immediate disappearance with the film, the conclusion seems reasonable to me that "exigent" circumstances existed which indicated that the film was in imminent danger of being "lost, destroyed, or spirited away." (*Flack* v. *Municipal Court, supra,* 66 Cal.2d at p. 991, fn. 10.)

The majority find significance in the fact that "Freeman's operation was . . . a continuing enterprise replete with office, secretary, reception room, and all the trappings of a permanent business arrangement." Such an appraisal, in all deference, misses the mark. We are concerned with movie film. The film, either singly or together, did not constitute office fixtures. It could be easily moved and readily carried by hand. The majority's analogy to a film shown at a theatre is not apt. This was not a situation in which the film was being shown over an extended period at predictable and ascertainable hours to a public admitted regularly on payment of a charge. This was a different case. The setting here was surreptitious. The conditions were clandestine. Defendants transported the film to the premises in one automobile and returned the film in another, and that within a very short time span. In between the use of the automobiles, a small handcart was utilized. The fact that the films were exhibited in a well established office complete with secretary detracts not one whit from the fact that the film which is the subject of our inquiry, was readily movable. The *Roaden* court itself took judicial notice of this fact and also noted the importance of the circumstances surrounding the exhibition of the film. (413 U.S. at p. 505, fn: 6 [37 L.Ed.2d at p. 765].) Both from what he heard and saw Deputy Young had very clear signals from defendants that their precise intentions were to remove and "spirit" the film away and speedily so. They had the capacity to match their intentions and this capacity had just been graphically demonstrated. A secretary was present. The officers presumably did not know how many other employees were available to aid defendants in their design.

While First Amendment protections affecting freedom of expression have been extended to motion picture films, *Roaden* and *Flack* nonetheless very expressly recognize the exception permitting seizure without warrant even of objects presumptively afforded First Amendment protection. The majority describe the exception as "narrow" or "extremely limited." Regardless, however, of its characterization the exception contains only two essential ingredients—first, probable cause to believe the seized material was obscene, and second, exigent circumstances prompting a reasonable belief that the property seized is about to be moved beyond the reach of the officers. I suggest that on the record the magistrate was fully justified in concluding that probable cause existed to believe that the material being seized was obscene and that a "legitimate emergency" existed involving, in the language of *Flack,* a "high probability that evidence may be lost, destroyed, or spirited away." (66 Cal.2d at p. 991, fn. 10.)

I would go further. Even if we accepted the majority's assumption that the officers lacked probable cause to believe the film viewed by Young

would be "spirited away," they certainly had such cause with respect to the film removed by Horne. This film was brought by Horne to the office in one car, transported by him to and from the office by handcart and then deposited in the back seat and trunk of another car, after which it was then taken in a random odyssey. As we recently explained in *People v. Dumas,* 9 Cal.3d 871, 884 [109 Cal.Rptr. 304, 512 P.2d 1208], an automobile may be subject to a warrantless search whenever "(1) exigent circumstances rendered the obtaining of a warrant an impossible or impractical alternative, and (2) probable cause existed for the search." As hereinabove indicated, in my view, the first element was fully satisfied. In *Dumas* we stated that "[p]robable cause for a search exists where an officer is aware of facts that would lead a man of ordinary caution or prudence to believe, and conscientiously to entertain, a strong suspicion that the object of the search is in the particular place to be searched." (*Id.* at p. 885.) The second condition was abundantly satisfied.

I would grant a peremptory writ of mandate to annul the order suppressing the evidence.

McComb, J., and Clark, J., concurred.